UNITED STATES, Appellee,

v.

Jimmy E. VANZANDT, Private First
Class, U.S. Army, Appellant.

No. 40,408.
CM 439773.

U.S. Court of Military Appeals.

Dec. 20, 1982.

For Appellee: *Major John T. Meixell* (argued); *Colonel R.R. Boller, Major Robert B. Williams, Captain Robert D. Higginbotham* (on brief); *Major Ted B. Borek.*

*Opinion of the Court*

EVERETT, Chief Judge:

Tried by general court-martial, the accused was convicted, despite his pleas, of possession and sale of heroin, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. The approved sentence extends to a bad-conduct discharge, confinement at hard labor for 1 year, forfeiture of all pay and allowances, and reduction to private (E–1). After the United States Army Court of Military Review affirmed the findings and sentence, we granted review on these three issues:

WHETHER THE APPELLANT WAS UNLAWFULLY ENTRAPPED BY AN AGENT OF THE GOVERNMENT INTO COMMITTING THE CHARGED OFFENSES.

WHETHER THE MILITARY JUDGE ERRED TO THE SUBSTANTIAL PREJUDICE OF THE APPELLANT BY INSTRUCTING ON THE PRINCIPLE OF AIDING AND ABETTING ("PRINCIPALS").

SHOULD THE JUDGE HAVE INSTRUCTED ON AGENCY AS A DEFENSE TO SPECIFICATION 2 OF THE CHARGE?

I

Specialist Four McDonald was apprehended by agents of the Criminal Investigation Command (CID) for the possession and sale of hashish on October 2, 1979. After being threatened with forty years in prison for these offenses and the likelihood of going to jail that night, McDonald agreed to cooperate with the CID in locating drug sellers and buying drugs on the military installation. According to his testimony he was scared and would have sought information about drugs from the first person he saw when he left the CID office.

For Appellant: *Captain Chuck R. Pardue* (argued); *Colonel Edward S. Adamkewicz, Jr., Major Robert D. Ganstine* (on brief); *Major Robert C. Rhodes, Captain James S. Currie.*

Immediately upon his release by the CID agents, McDonald went directly to appellant's unit, where the first person he encountered was Vanzandt. The two men were casual acquaintances and McDonald had no reason to suspect that appellant was involved in the drug trade. Nevertheless, he asked if Vanzandt knew where he could get some "dope." Appellant responded in the negative but suggested that McDonald ask around. McDonald persisted, telling appellant that he "really had to have it bad." Four times appellant declined to cooperate, but he finally told McDonald, "well, he might could get ... [him] some heroin." Although McDonald was looking for hashish, he was willing to take heroin, purportedly to swap for "some hash."[1] Vanzandt told McDonald that he would check and that they should go to his room. McDonald, after replying that he would meet appellant there, left to confer with the CID agents. After searching McDonald, the agents supplied him with three twenty-dollar bills, whose serial numbers had been recorded. Proceeding to appellant's room, McDonald found Vanzandt and one of his roommates. Appellant was sitting at a desk and four packets lay on the corner of the desk.[2] "Vanzandt said, 'right there,'" and nodded his head in the direction of the packets. McDonald opened one packet and commented, "that's small for twenty dollars," but appellant failed to respond. McDonald picked up three packets, left sixty dollars in their place, and departed to deliver the packets to the CID agents. Subsequent laboratory analysis disclosed the presence of heroin in each packet. The entire process—from McDonald's first approach to appellant through the consummation of the sale—took approximately twenty-five minutes.

According to Vanzandt, the source of the heroin was Gourdine, another of his roommates. Gourdine, whom Vanzandt knew to

be a drug dealer, had not been present when McDonald picked up the heroin, but McDonald had seen him in the area when he entered appellant's room. Because appellant had not known how many packets McDonald would want, Gourdine had left more than three packets on the table. Vanzandt's testimony was confusing and self-contradictory as to whether he paid Gourdine with his own money and then collected from McDonald upon resale of the heroin or whether he delivered the packets to McDonald, collected sixty dollars from him, and then remitted the proceeds to Gourdine. In any event, appellant denied making any profit on the transaction.

## II

### A

Statutes specifying particular criminal offenses normally do not contain an exception based upon entrapment by government agents; instead, the entrapment defense is based upon an exception which courts have engrafted upon these statutes. The case often cited[3] for first recognizing the entrapment defense in federal court is *Woo Wai v. United States,* 223 F. 412 (9th Cir. 1915). There, immigration agents induced the defendant, a Chinese merchant, to bring Chinese citizens illegally across the Mexican border into California in order to place him in a situation where he might be compelled to disclose what he was believed to know about the previous illegal importation of Chinese women into San Francisco. With great reluctance, the defendant agreed to participate in the scheme. The trial judge instructed the jury that, even if they should find the facts to be as testified to by the defendant, no valid defense would be established to the charge embraced in the indictment. Reversing, the Court of Appeals said:

there had been at least three and, later, that there had been at least four.

---

1. McDonald testified that he asked for "dope" and Vanzandt first mentioned "skag," a street term for heroin. Appellant confirmed that McDonald did not ask for any specific drug.

2. McDonald said there had been four packets on the desk. Initially appellant testified that

3. *United States v. Russell,* 411 U.S. 423, 428 n. 5, 93 S.Ct. 1637, 1641 n. 5, 36 L.Ed.2d 366 (1973).

We are of the opinion that it is against public policy to sustain a conviction obtained in the manner which is disclosed by the evidence in this case, taking the testimony of the defendants to be true, and that a sound public policy can be upheld only by denying the criminality of those who are thus induced to commit acts which infringe the letter of the criminal statutes.

*Id.* at 415.

The Supreme Court first recognized the entrapment defense in *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932). A prohibition agent posing as a tourist went to the home of Sorrells and while they reminisced about their experiences as members of the same Army division during World War I, the agent asked Sorrells three times to get him some liquor. Finally, Sorrells left his home and came back with a half-gallon bottle of liquor which he sold to the agent. The agent testified that he was the only one who mentioned anything about securing liquor and that he did so with the purpose of prosecuting the defendant for procuring and selling it. Sorrells produced evidence from others to the effect that he was not in the illicit liquor trade and that he had obtained the liquor just for a "former war buddy." The trial court refused to submit the issue of entrapment to the jury and Sorrells was convicted.

Upon appeal to the Supreme Court, the Solicitor General argued that "[s]ince the defendant has intentionally committed all the acts constituting the crime charged . . . the courts . . . [could] not absolve him from guilt because an officer of the Government instigated the crime." Conceding that there were situations where the conduct of government agents was "so plainly the provocation for violation of [the] law that

public policy require[d] that the courts should not permit a prosecution for such violation to continue," he argued that "such conduct does not give rise to a defense, but rather calls into operation the courts' power to prevent official abuses." The remedy, "therefore . . . should be . . . a special plea in bar, since the defendant . . . [could] not contend that he . . . [was] not guilty" and, hence, could not raise the defense after "a plea of not guilty." [4] *Id.* at 437, 53 S.Ct. at 211. The Supreme Court rejected this view and reversed.

The Court noted "that the evidence was sufficient to warrant a finding that the . . . [crime] for which defendant" stood convicted had been "instigated by the prohibition agent," and that such conduct was "a gross abuse of authority" deserving "the severest condemnation." However, the question remained whether the act of the agent "preclude[d] prosecution or afford[ed] a ground of defense, and, if so, upon what theory." *Id.* at 441, 53 S.Ct. at 212. Writing for the majority, Chief Justice Hughes held:

It is well settled that the fact that officers or employees of the government merely afford opportunities or facilities for the commission of the offense does not defeat the prosecution. Artifice and stratagem may be employed to catch those engaged in criminal enterprises. [Citations omitted.] The appropriate object of this permitted activity, frequently essential to the enforcement of the law, is to reveal the criminal design; to expose the illicit traffic, the prohibited publication, the fraudulent use of the mails, the illegal conspiracy, or other offenses, and thus to disclose the would-be violators of the law. A different question is presented when the criminal design originates with the officials of the government, and

---

4. Because of a supposed inconsistency between the entrapment defense and a plea of not guilty, some courts require "admission of guilt of the crime charged and all of its elements" before a defendant can claim entrapment. *United States v. Hill,* 655 F.2d 512, 514 (3d Cir.1981); *see also United States v. McGlenn,* 8 U.S.C.M.A. 286, 24 C.M.R. 96 (1957). However, there is growing recognition that the two defenses are not necessarily inconsistent. *United States v. Greenfield,* 554 F.2d 179 (5th Cir.1977), *cert. denied,* 439 U.S. 860, 99 S.Ct. 178, 58 L.Ed.2d 168 (1978); *United States v. Demma,* 523 F.2d 981 (9th Cir.1975); *see also United States v. Brooks,* 611 F.2d 614 (5th Cir.1980); *United States v. Garcia,* 1 M.J. 26, 27 (C.M.A.1975).

they implant in the mind of an innocent person the disposition to commit the alleged offense and induce its commission in order that they may prosecute.

*Id.* at 441–42, 53 S.Ct. at 212–13.

Rejecting the argument that the defendant's intentional act violated the express terms of the statute and that courts were not free to bar a prosecution because of their opinion that the crime charged has been instigated by government officials, Chief Justice Hughes found such application of the statute would be foreign to its purpose and observed:

We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them.

. . . .

[But] [w]e are unable to approve the view that the court, although treating the statute as applicable despite the entrapment, and the defendant as guilty, has authority to grant immunity, or to adopt a procedure to that end. It is the function of the court to construe the statute, not to defeat it as construed. Clemency is the function of the Executive. [Citation omitted.]

*Id.* at 448, 449, 53 S.Ct. at 215. He further recognized that "[t]he predisposition and criminal design of the defendant are relevant" and in establishing these things, "issues of a collateral character relating to the activities of the officials of the government and to the conduct and purposes of the defendant previous to the alleged offense" could be raised. *Id.* at 451, 53 S.Ct. at 216. In conclusion, Chief Justice Hughes held:

The defense is available, not in the view that the accused though guilty may go free, but that the government cannot be permitted to contend that he is guilty of a crime where the government officials

are the instigators of his conduct. . . . Fundamentally, the question is whether the defense, if the facts bear it out, takes the case out of the purview of the statute because it cannot be supposed that the Congress intended that the letter of its enactment should be used to support such a gross perversion of its purpose.

*Id.* at 452, 53 S.Ct. at 216. Since evidence produced by Sorrells raised the defense of entrapment, the trial court erred in ruling that, as a matter of law, there was no entrapment and in refusing to submit the issue to the jury.

Justice Roberts, writing for himself and two other Justices, viewed the entrapment defense as based upon the refusal of courts to "tolerate the use of their process to consummate a wrong." *Id.* at 455, 53 S.Ct. at 217 (footnote omitted). He observed that the entrapment defense had been recognized in "an amazing total" of cases "doubtless due to the creation by statute of many new crimes (e.g., sale and transportation of liquor and narcotics) and the correlative establishment of special enforcement bodies for the detection and punishment of offenders."[5] *Id.* at 453, 53 S.Ct. at 217. In his view

where a law officer envisages a crime, plans it, and activates its commission by one not theretofore intending its perpetration, for the sole purpose of obtaining a victim through indictment, conviction and sentence, the consummation of so revolting a plan ought not to be permitted by any self-respecting tribunal. Equally true is this whether the offense is one at common law or merely a creature of statute. Public policy forbids such sacrifice of decency. The enforcement of this policy calls upon the court, in every instance where alleged entrapment of a defendant is brought to its notice, to ascertain the facts, to appraise their effect upon the administration of justice, and to make such order with respect to

---

**5.** The "amazing total" has become "a veritable legion of opinion." *United States v. Greenfield, supra* at 181. It would be virtually impossible, if not purposeless, to attempt to catalog the federal cases alone where the entrapment defense has been raised.

the further prosecution of the cause as the circumstances require.

*Id.* at 454–55, 53 S.Ct. at 217.

He criticized the majority for its "new method of rationalizing the defense" (*id.* at 455, 53 S.Ct. at 218) by creating a condition in the statute exempting from its operation an entrapped offender. This "strained and unwarranted construction of the statute . . . gives to the defendant a double defense under his plea of not guilty, namely, (a) that what he did does not fall within the definition of the statute, and (b) entrapment." *Id.* at 456, 53 S.Ct. at 218. Moreover, such an interpretation of the defense does not provide a guide as to when a statute should be interpreted as excluding a defense of entrapment or when it should be included. Instead Justice Roberts rested application of the doctrine on this "fundamental rule of public policy":

> The protection of its own functions and the preservation of the purity of its own temple belongs only to the court. It is the province of the court and of the court alone to protect itself and the government from such prostitution of the criminal law. The violation of the principles of justice by the entrapment of the unwary into crime should be dealt with by the court no matter by whom or at what stage of the proceedings the facts are brought to its attention. Quite properly it may discharge the prisoner upon a writ of *habeas corpus.* Equally well may it quash the indictment or entertain and try a plea in bar. But its powers do not end there. Proof of entrapment, at any stage of the case, requires the court to stop the prosecution, direct that the indictment be quashed, and the defendant set at liberty. If in doubt as to the facts it may submit the issue of entrapment to a jury for advice. But whatever may be the finding upon such submission the power and the duty to act remain with the court and not with the jury.
>
> . . . .
>
> Recognition of the defense of entrapment as belonging to the defendant and as raising an issue for decision by the jury called to try him upon plea of the general issue, results in the trial of a false issue wholly outside the true rule which should be applied by the courts. It has been generally held, where the defendant has proved an entrapment, it is permissible for the government to show in rebuttal that the officer guilty of incitement of the crime had reasonable cause to believe the defendant was a person disposed to commit the offense. . . . The proof received in rebuttal usually amounts to no more than that the defendant had a bad reputation, or that he had been previously convicted. Is the statute upon which the indictment is based to be further construed as removing the defense of entrapment from such a defendant?
>
> Whatever may be the demerits of the defendant or his previous infractions of law these will not justify the instigation and creation of a new crime, as a means to reach him and punish him for his past misdemeanors.
>
> . . . .
>
> The applicable principle is that courts must be closed to the trial of a crime instigated by the government's own agents. No other issue, no comparison of equities as between the guilty official and the guilty defendant, has any place in the enforcement of this overruling principle of public policy.

*Id.* at 457, 458, 459, 53 S.Ct. at 218, 219 (footnotes omitted).

In *Sorrells,* five Justices of the Supreme Court believed that the defense of entrapment was factual, based upon an implied exception to statutory crimes, and, where raised, must be submitted to the jury. Three Justices believed that the defense existed as a matter of public policy, could be raised at any time before or after the plea, and was to be ruled upon by the judge as part of the overall policy of not allowing the judicial system to condone the perpetration of an offense by agents of the Government through instigating an otherwise innocent person to commit a crime. The remaining Justice would have affirmed.

The Supreme Court reaffirmed the *Sorrells* doctrine in *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958). There, the defendant met a government informer at a doctor's office where both apparently were being treated for narcotics addiction. After several further meetings, the informer asked the defendant to supply him with a source for drugs. The defendant refused several times, but finally acquiesced and shared narcotics he possessed with the informer. After several such sales, the informer told agents of the Bureau of Narcotics that he had another seller for them. The issue of "whether the informer had convinced an otherwise unwilling person to commit a . . . [crime], or whether . . . [the defendant] was already predisposed to commit the act and exhibited only the natural hesitancy of one acquainted with the narcotics trade" was submitted to the jury. *Id.* at 371, 78 S.Ct. at 820. Conviction followed. In holding that the defense of entrapment had been established as a matter of law from the undisputed testimony of the prosecution witnesses,[6] Chief Justice Warren wrote for a five-member majority:

> To determine whether entrapment has been established, a line must be drawn between the trap for the unwary innocent and the trap for the unwary criminal. The principles by which the courts are to make this determination were outlined in *Sorrells*. On the one hand, at trial the accused may examine the conduct of the government agent; and on the other hand, the accused will be subjected to an "appropriate and searching inquiry into his own conduct and predisposition" as bearing on his claim of innocence. [Citation omitted.]

*Id.* at 372–73, 78 S.Ct. at 821.

The Court found significant the recurring meetings; conversations concerning mutual experiences in regard to narcotics addiction; the informer's resort to sympathy; the numerous requests; defendant's continued refusal, then evasiveness, and finally hesitancy to capitulate; and the informer's inducing of defendant to return to the narcotics habit. Moreover, the Government's claim that defendant "evinced a 'ready complaisance' to accede to" the informer's requests was not supported by the evidence (*id.* at 375, 78 S.Ct. at 822), for defendant was not in the narcotics trade; a search of his apartment after arrest revealed no drugs; and he apparently had never made a profit on the sales. Even a nine-year-old conviction for sale and a five-year-old conviction for possession of drugs were insufficient to prove a readiness to sell narcotics. "Thus the Government plays on the weaknesses of an innocent party and beguiles him into committing crimes which he otherwise would not have attempted. Law enforcement does not require methods such as this." *Id.* at 376, 78 S.Ct. at 822 (footnote omitted). However, the Court rejected the contention that the principles announced by Justice Roberts in *Sorrells v. United States, supra,* should be applied, for these reasons: First, "although the defendant could claim that the Government had induced him to commit the crime, the Government" under the Roberts' view would not be allowed to "reply by showing that the defendant's criminal conduct was due to his own readiness"; and second, unlike Justice Roberts, the majority believed that "the factual issue of entrapment should be decided by the" jury, not by the judge. *Id.* at 376–77, 78 S.Ct. at 823.

Justice Frankfurter and three other Justices concurred in the result with a separate opinion. He noted that the law of entrapment was "as much in doubt today as it was . . . over forty years ago." *Id.* at 378, 78 S.Ct. at 823. He wrote:

> In these cases raising claims of entrapment, the only legislative intention that can with any show of reason be extracted from the statute is the intention to make criminal precisely the conduct in which the defendant has engaged. That conduct includes all the elements necessary to constitute criminality. Without compulsion and "knowingly," where that is requisite, the defendant has violated the

---

6. The defense called no witnesses.

statutory command. If he is to be relieved from the usual punitive consequences, it is on no account because he is innocent of the offense described. In these circumstances, conduct is not less criminal because the result of temptation, whether the tempter is a private person or a government agent or informer.

The courts refuse to convict an entrapped defendant, not because his conduct falls outside the proscription of the statute, but because, even if his guilt be admitted, the methods employed on behalf of the Government to bring about conviction cannot be countenanced.... They do this in the exercise of a recognized jurisdiction to formulate and apply "proper standards for the enforcement of the federal criminal law in the federal courts," [citation omitted] an obligation that goes beyond the conviction of the particular defendant before the court.

*Id.* at 379–80, 78 S.Ct. at 824.

The statute is wholly directed to defining and prohibiting the substantive offense concerned and expresses no purpose, either permissive or prohibitory, regarding the police conduct that will be tolerated in the detection of crime.

*Id.* at 381, 78 S.Ct. at 825.

The crucial question, not easy of answer, to which the court must direct itself is whether the police conduct revealed in the particular case falls below standards, to which common feelings respond, for the proper use of governmental power. For answer it is wholly irrelevant to ask if the "intention" to commit the crime originated with the defendant or government officers, or if the criminal conduct was the product of "the creative activity" of law-enforcement officials.... Of course in every case of this kind the intention that the particular crime be committed originates with the police, and without their inducement the crime would not have occurred. But ... where the police in effect simply furnished the opportunity for the commission of the crime, ... this is not enough to enable the defendant to escape conviction.

The intention referred to, therefore, must be a general intention or predisposition to commit, whenever the opportunity should arise, crimes of the kind solicited, and in proof of such a predisposition evidence has often been admitted to show the defendant's reputation, criminal activities, and prior disposition. The danger of prejudice ... particularly if the issue of entrapment must be submitted to the jury and disposed of by a general verdict of guilty or innocent, is evident. The defendant must either forego the claim of entrapment or run the substantial risk that, in spite of instructions, the jury will allow a criminal record or bad reputation to weigh in its determination of guilt of the specific offense of which he stands charged.... Past crimes do not forever outlaw the criminal and open him to police practices, aimed at securing his repeated conviction, from which the ordinary citizen is protected.

*Id.* at 382–83, 78 S.Ct. at 825–26.

This test shifts attention from the record and predisposition of the particular defendant to the conduct of the police and the likelihood, objectively considered, that it would entrap only those ready and willing to commit crime. It is as objective a test as the subject matter permits, and will give guidance in regulating police conduct that is lacking when the reasonableness of police suspicions must be judged or the criminal disposition of the defendant retrospectively appraised.... The power of government is abused and directed to an end for which it was not constituted when employed to promote rather than detect crime and to bring about the downfall of those who, left to themselves, might well have obeyed the law. Human nature is weak enough and sufficiently beset by temptations without government adding to them and generating crime.

What police conduct is to be condemned, because likely to induce those not otherwise ready and willing to commit crime, must be picked out from case to case as new situations arise involving

different crimes and new methods of detection.

*Id.* at 384, 78 S.Ct. at 827.

Thus, over the years two conflicting views of the entrapment defense have been asserted by members of the Supreme Court. The majority view, espousing a subjective test, looks to the acts of the police in encouraging the commission of the crime as balanced against the propensity of the defendant to engage in the activity. Evidence of the defendant's prior conduct is admissible as bearing upon his often unexpressed and otherwise undetectable criminal state of mind, and the balancing of the evidence on both sides is to be performed by the jury upon proper instructions from the judge. Under the minority view, which employs an objective test, the trial judge has the responsibility of examining the conduct of the police in promoting the commission of the criminal act to determine whether it was of such a nature that the courts should not assist in securing the defendant's conviction.[7]

In *United States v. Russell,* 411 U.S. 423, 93 S.Ct. 1637, 36 L.Ed.2d 366 (1973), a government agent supplied certain raw materials to the defendant knowing that they would be used in the illicit manufacture of methamphetamine, in order to infiltrate the drug organization. The district judge submitted the defense to the jury on the standard entrapment instruction and conviction followed. On appeal, defendant conceded that the jury could have found him predisposed to commit the offenses but argued that the facts established entrapment as a matter of law. The Court of Appeals reversed on the ground "that there has been 'an intolerable degree of governmental participation in the criminal enterprise,'" since the government agent had "suppl[ied] a scarce ingredient essential for the manufacture of ... [the] controlled substance... This new defense" was based "on either of two alternative theories":

One theory ... found entrapment, regardless of predisposition, whenever the government supplies contraband to the defendants. *United States v. Bueno,* 447 F.2d 903 (5th Cir.1971); ... The second theory, a nonentrapment rationale is based on a ... decision that reversed a conviction because a government investigator was so enmeshed in the criminal activity that the prosecution of the defendants was held to be repugnant to the American criminal justice system. *Greene v. United States,* 454 F.2d 783 (9th Cir.1971).

*United States v. Russell, supra,* at 427–28, 93 S.Ct. at 1640–41. Both of these theories apparently stemmed from Justice Frankfurter's concurring opinion in *Sherman v. United States, supra.*

In a five-to-four decision, the Supreme Court reversed the Court of Appeals and upheld the convictions. Although recognizing that

we may some day be presented with a situation in which the conduct of law enforcement agents is so outrageous that due process principles would absolutely bar the government from invoking judicial processes to obtain a conviction, ... [t]he law enforcement conduct here stops far short of violating that "fundamental fairness, shocking to the universal sense of justice," mandated by the Due Process Clause of the Fifth Amendment.

*Id.* at 431–32, 93 S.Ct. at 1643. Reaffirming the prevailing opinions in *Sorrells v. United States* and *Sherman v. United States, both supra,* and rejecting the views of the concurring Justices in those cases, the majority explained:

[E]ntrapment is a relatively limited defense. It is rooted, not in any authority of the Judicial Branch to dismiss prosecutions for what it feels to have been "overzealous law enforcement," but instead in the notion that Congress could not have intended criminal punishment for a de-

---

**7.** Since the majority view is predicated on purported statutory interpretation, it would seem that an explicit legislative rejection of the entrapment defense would be binding on the courts. Under the minority view, the defense might be less susceptible to legislative abolition.

fendant who has committed all the elements of a proscribed offense but was induced to commit them by the Government.

*Id.* at 435, 93 S.Ct. at 1644.

It is only when the Government's deception actually implants the criminal design in the mind of the defendant that the defense of entrapment comes into play. *Id.* at 436, 93 S.Ct. at 1645. Since defendant "was an active participant in" the illicit "drug manufacturing enterprise . . . before the Government agent appeared on the scene, and continued" in the business "after the . . . agent . . . left the scene . . . [h]e was . . . not an 'unwary innocent' but an 'unwary criminal.' " *Id.*

Thus, if the defendant's "predisposition" to commit the crime is continuing, the fact that a government agent supplies the materials for conducting some portion of his illicit enterprise does not establish the defense of entrapment as a matter of law, but instead the defense must be submitted to the jury for its consideration as to guilt or innocence. *Id.* at 432, 93 S.Ct. at 1643.

Subsequently, in *Hampton v. United States,* 425 U.S. 484, 96 S.Ct. 1646, 48 L.Ed.2d 113 (1976), the Court was faced with the question of whether a defendant may be convicted for the sale of contraband drugs which he procured from a government informer or agent. According to the government informer, he and Hampton were pool-playing acquaintances. Hampton noticed needle marks on the informer's arms and told him that he needed money and knew where to get some heroin. The informer arranged a meeting with Drug Enforcement Administration agents who, posing as narcotics dealers, purchased a packet of heroin from Hampton. A second sale was arranged for the next evening. After the sale was consummated, other agents arrested Hampton.

Hampton provided a different version of the events. He contended that, in response to his statement that he was short of cash, the informer told him that he had a friend who could produce a non-narcotic counterfeit drug which gave the same reaction as

heroin, and proposed to sell that drug to gullible acquaintances who would believe they were buying heroin. Hampton asserted that he never intended to sell heroin and that all the drugs he sold were supplied by the informer. He requested an instruction to the effect that, if the jury believed that the government informer had supplied the narcotics which were the subject of the sales, he must be acquitted "because the law as a matter of policy forbids his conviction in such a case," (*id.* at 488, 96 S.Ct. at 1649) regardless of whether he harbored a predisposition to commit the offenses. The trial court refused the instruction and Hampton was convicted.

The lead opinion was written by Justice Rehnquist for himself and two other Justices. Relying on *United States v. Russell, supra,* he "ruled out the possibility that the defense of entrapment could ever be based upon governmental misconduct in a case, such as this one, where the predisposition of the defendant to commit the crime was established." *Hampton v. United States, supra* at 488–89, 96 S.Ct. at 1649. Only when government agents violate some protected right of the defendant does the Due Process Clause of the Fifth Amendment of the Constitution come into play. Here the defendant and the informer "acted in concert with one another." If the Government's activity implants the disposition to commit the crime in the mind of an innocent person, the defense of entrapment will be permitted. However, if the government agents engage "in illegal activity in concert with a defendant beyond the scope of their duties the remedy lies, not in freeing the equally culpable defendant, but in prosecuting the . . . [agents] under the applicable provisions of state or federal law." *Id.* at 490, 96 S.Ct. at 1650.

Justices Powell and Blackmun, concurring in the judgment, rejected the proposition that the Government's supplying the contraband to the defendant constituted a *per se* denial of due process, but they refused to agree that the due process guarantee "would never prevent the conviction of a predisposed defendant, regardless of the

outrageousness of police behavior in light of the surrounding circumstances." *Id.* at 492, 96 S.Ct. at 1651. They considered that the earlier cases concerning "overinvolvement" of the police in contraband cases did not reach "such proportions as to bar conviction of a predisposed defendant as a matter of due process," but they could not "conclude that an analysis other than one limited to predisposition would never be appropriate under due process principles." *Id.* at 493, 96 S.Ct. at 1651–52 (footnotes omitted).

The discussion of predisposition, for example, often seems to overlook the fact that there may be widely varying degrees of criminal involvement. Taking the narcotics traffic as an example, those who distribute narcotics—the "pushers"—are the persons who, next to those who import or manufacture, merit most the full sanction of the criminal law. Yet, the criminal involvement of pushers varies widely. The hardcore professional, in the "business" on a large scale and for years, is to be contrasted with the high-school youth whose "pushing" is limited to a few of his classmates over a short span of time. Predisposition could be proved against both types of offenders, and under the flat rule enunciated today by the plurality the differences between the circumstances would be irrelevant despite the most outrageous conduct conceivable by Government agents relative to the circumstances. A fair system of justice normally should eschew unbending rules that foreclose, in their application, all judicial discretion.

*Id.* at 494 n. 5, 96 S.Ct. at 1652 n. 5.

The three dissenting Justices adhered to the minority views expressed in *United States v. Russell, Sherman v. United States,* and *Sorrells v. United States,* all *supra,* that:

[T]he determination of the lawfulness of the Government's conduct must be made—as it is on all questions involving the legality of law enforcement methods—by the trial judge, not the jury. *Id.* at 497, 96 S.Ct. at 1653.

Thus, it would appear that the Supreme Court has moved to a position that the subjective test for entrapment is paramount to the exclusion of the objective test—except for that unique, peculiar situation where the conduct of the government agents reaches the point of shocking the judicial conscience.

Our own precedents reflect a somewhat similar development of the entrapment doctrine. In *United States v. McGlenn,* 8 U.S. C.M.A. 286, 290, 24 C.M.R. 96, 100 (1957), Judge Ferguson held that:

Once the defense had introduced evidence showing inducement of the accused by one acting as a Government agent, the prosecution was then required to show that excuse—reasonable grounds or suspicion to believe that the accused was dealing in narcotics—existed to justify the inducement.

Thus, although the Government need not have "probable cause" to believe that the accused was previously engaged in the commission of the crime, the entrapment defense will succeed unless the Government can "prove that its agents acted under a reasonable belief that the law was being violated by the accused" when they offered inducements to the accused. *Id.* at 291, 24 C.M.R. at 101. Otherwise, " 'the original suggestion or initiative must have come from the perpetrator.' " *Id.* at 292, 24 C.M.R. at 102, quoting *United States v. Certain Quantities of Intoxicating Liquors,* 290 F. 824 (D.N.H.1923).[8]

In *United States v. Suter,* 21 U.S.C.M.A. 510, 45 C.M.R. 284 (1972), the accused contended that since the original suggestion did not come from him and the Government failed to prove that prior to the transaction he was reasonably suspected of criminal activity or otherwise predisposed to the commission of the crime, the defense of

---

8. The two-pronged test in *United States v. McGlenn, supra,* antedates *Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958), and *United States v. Russell, supra,* and did not specifically consider *Sorrells v. United States,* 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932).

entrapment would lie. We rejected his contention, for the evidence of record showed that only a single invitation had been required to cause the accused to engage in the illegal activity and that

> there were no words of persuasion, trickery, or fraud used in the transaction which in any fashion caused the appellant's thinking to alter to such an extent to say that the *criminal purpose* was the creation of the informers rather than his.

We held that "there . . . [was] no illegal 'inducement' which" would have required "the Government . . . to produce evidence of a prior existing criminal disposition" to avoid the entrapment defense. Further, the record did not show "the shocking display of conduct on the part of law enforcement officials which the law of entrapment was designed to purge." *Id.* at 516, 45 C.M.R. at 290. In sum, *Suter* seems to have utilized both the subjective and objective tests for the establishment of the entrapment defense.

In *United States v. Garcia,* 1 M.J. 26 (C.M.A.1975), we held that:

> The defense of entrapment is not predicated upon the degree of covert police involvement in the criminal activity of the accused; rather, it is rooted in the concept that Government officers cannot instigate the commission of a crime by one who would otherwise remain law abiding. Consequently, the focus of the defense is not upon the Government agent but upon the accused, and the essential inquiry is upon the accused's "intent or predisposition . . . to commit the crime." [Citation omitted.]

Observing that the accused had agreed to the sale immediately upon being asked, and that he had accepted the money for the drug "without qualm or disquiet," we held that the evidence, as provided by the informer, "exclude[d] any possibility" of entrapment. *Id.* at 29. *See also United States v. Hebert,* 1 M.J. 84 (C.M.A.1975).[9]

■ Tracking the meanderings of the law of entrapment requires the instincts of a pathfinder and the skills of a surveyor. Without claiming the attributes of either, we can identify certain rules which govern the entrapment defense. First, the defense is not raised unless the accused's commission of the alleged criminal act is proven beyond reasonable doubt, and there is evidence that the suggestion or inducement for the offense originated with a government agent. Second, once the defense is raised, the Government must prove that the accused was predisposed to commit the criminal activity[10] and needed only the opportunity to commit the crime. Third, with one limited exception,[11] the issue must be resolved by the fact finder.

■ The accused may raise the issue either through his own evidence or through cross-examination of the government witnesses. After the issue is raised, the Government may counter with its own evidence as to the intent and predisposition of the accused to commit the crime—which may include evidence of past misconduct. In any event, the Government must prove the absence of entrapment beyond a reasonable doubt just like any element of the crime.[12]

9. Recently, we considered application of the agency defense, *United States v. Suter,* 21 U.S.C.M.A. 510, 45 C.M.R. 284 (1972); *United States v. Fruscella,* 21 U.S.C.M.A. 26, 44 C.M.R. 80 (1971), to the entrapment defense. *United States v. Steinruck,* 11 M.J. 322 (C.M.A. 1981). There, the majority held that the two defenses were available in the same case.

10. *See United States v. Hill, supra,* where expert testimony as to the defendant's unique susceptibility to inducement was permitted pursuant to Fed.R.Evid. 702 and 405.

11. The due-process defense is one of law for the trial judge. *United States v. Gonzales,* 539

F.2d 1238 (9th Cir.1976). As noted earlier, there is no constitutionally imposed requirement of reasonable suspicion before an undercover operation, e.g. ABSCAM, can be commenced. *United States v. Jannotti,* 673 F.2d 578 (3d Cir.1982), *cert. denied* — U.S. — , 102 S.Ct. 2906, 73 L.Ed.2d 1315 (1982); *United States v. Myers,* 635 F.2d 932 (2d Cir.1980), *cert. denied,* 449 U.S. 956, 101 S.Ct. 364, 66 L.Ed.2d 221 (1980).

12. Under the law of entrapment, once the defendant shows some evidence that the government induced him to commit the offense, the burden is on the government to

■ Thus, the subjective test of entrapment involves balancing the accused's resistance to temptation against the amount of government inducement. The focus is on the accused's latent predisposition to commit the crime, which is triggered by the government inducement. The existence of reasonable suspicion by the police is immaterial, so there is no occasion to offer or receive evidence establishing whether or why any suspicion existed. Indeed, frequently the information which establishes reasonable suspicion is hearsay in nature and its consideration by court members, even under limiting instructions, may be prejudicial to the accused.[13]

■ One last caution should be stated: The latitude given the Government in "inducing" the criminal act is considerably greater in contraband cases (drugs, liquor) —which are essentially "victim-less" crimes [14]—than would be permissible as to other crimes, where commission of the acts would bring injury to members of the public. It would appear that, in giving such latitude, courts recognize that the Government needs more leeway in detecting and combating these illicit enterprises.

## B

In the case at bar, the military judge submitted the defense of entrapment [15] to

prove beyond a reasonable doubt that the defendant was predisposed to commit the offense. [Citation omitted.] In this way the government proves that the defendant was not entrapped.
*United States v. Hammond,* 598 F.2d 1008, 1011 (5th Cir.1979); *see also United States v. Till,* 609 F.2d 228 (5th Cir.1980), *cert. denied,* 445 U.S. 955, 100 S.Ct. 1607, 63 L.Ed.2d 791 (1980).

13. A supposed virtue of the "objective" view of entrapment is that it places the defense in the hands of the judge rather than the jury. Obviously there is a danger that in establishing an accused's "predisposition," the prosecution may prejudice the trier of fact against the accused by evidence of his past misdeeds.

14. The illicit manufacture of drugs is not a sporadic, isolated criminal incident, but a continuing, though illegal, business enterprise. In order to obtain convictions for illegally manufacturing drugs, the gathering of evidence of past unlawful conduct frequently proves to be an all but impossible task. Thus in drug-related offenses law enforcement personnel have turned to one of the only practicable means of detection: the infiltration of drug rings and a limited participation in their unlawful present practices. Such infiltration is a recognized and permissible means of investigation; if that be so, then the supply of some item of value that the drug ring requires must, as a general rule, also be permissible. For an agent will not be taken into the confidence of the illegal entrepreneurs unless he has something of value to offer them. Law enforcement tactics such as this can hardly be said to violate "fundamental fairness" or [be] "shocking to the universal sense of justice," *Kinsella* ... [*v. United States ex. rel. Singleton,* 361 U.S. 234, 246, 80 S.Ct. 297, 304, 4 L.Ed.2d 268 (1960) ].
*United States v. Russell, supra* at 432, 93 S.Ct. at 1643.

I emphasize that the cases, if any, in which proof of predisposition is not dispositive will be rare. Police overinvolvement in crime would have to reach a demonstrable level of outrageousness before it could bar conviction. This would be especially difficult to show with respect to contraband offenses, which are so difficult to detect in the absence of undercover Government involvement. One cannot easily exaggerate the problems confronted by law enforcement authorities in dealing effectively with an expanding narcotics traffic, [citations omitted] which is one of the major contributing causes of escalating crime in our cities. [Citations omitted.] Enforcement officials therefore must be allowed flexibility adequate to counter effectively such criminal activity.
*Hampton v. United States, supra* at 495-96 n. 7, 96 S.Ct. at 1653 n. 7 (Powell, J., concurring in the judgment).

15. The military definition of entrapment is found in paragraph 216e, Manual for Courts-Martial, United States, 1969 (Revised edition). It is derived from *Sorrells v. United States* and *Sherman v. United States,* both *supra,* and 21 Am.Jur.2d, Criminal Law, § 144 (1965). *Air Force Summary of Changes in the Manual for Courts-Martial, 1969,* 98. In instructing the court members, the judge incorporated in a backhanded way an objective test, which apparently was derived from *McGlenn.* His instruction, which appears to have been based on a form, advised the members:

However, even if the original suggestion or initiative did not come from the accused you may, nevertheless, find that he was not entrapped, if you're satisfied beyond a reasonable doubt that the government agent or informant had reasonable grounds to believe or suspect that the accused was already actively engaged in the same type of criminal activity

the court members, who, in returning a finding of guilty, impliedly rejected it. The Court of Military Review also rejected appellant's contention and observed:

> McDonald initially did not ask the appellant to sell him drugs, but rather asked where he could obtain them. Instead of merely referring McDonald to Gourdine, appellant offered to facilitate the transaction. Although the appellant initially was wary of McDonald, it took only 25 minutes from the time he met McDonald for him to agree to obtain heroin, obtain it from Gourdine, and consummate the sale. The court members concluded that the appellant was not entrapped.

Unpublished, CM 439773, p. 3 (December 18, 1980)).

 Since the trier of fact found against him on the entrapment issue, appellant can only prevail by showing that these findings are incorrect as a matter of law. *United States v. Albright*, 9 U.S.C.M.A. 628, 26 C.M.R. 408 (1958). The test to be applied is whether the evidence of record supports the factual determinations made at the trial level and affirmed by the Court of Military Review. *United States v. Wilson*, 6 M.J. 214 (C.M.A.1979); *United States v. Arias*, 3 M.J. 436 (C.M.A.1977); *United States v. Lowry*, 2 M.J. 55 (C.M.A.1976). Viewing "the evidence ... 'in the light most favorable to the Government,'" *United States v. Arias, supra* at 437, we conclude that the entrapment defense was properly rejected and that this case is unlike *Sherman v. United States, supra,* where the Supreme Court held "that entrapment was established as a matter of law ... from the undisputed testimony of the prosecution's witnesses." 356 U.S. at 373, 78 S.Ct. at 821.

After McDonald sought to obtain "dope," appellant was the first to mention heroin specifically. Subsequently, appellant re-

quested McDonald to come to his room, found a source on short notice, collected the money, offered a quantity in excess of that purchased, and completed the entire transaction in a matter of some twenty-five minutes. Moreover, some of appellant's confusing testimony was subject to an interpretation by the court members that he had procured the heroin with his own money and had set the price for it. On these facts, we cannot conclude that, as a matter of law, Vanzandt lacked a "predisposition" to commit the crime.

While there might be varying views about the desirability of the tactics which, according to McDonald, had been employed by the CID in enlisting his wholehearted cooperation, the record does not disclose such outrageous police behavior that, under the views expressed by five Justices in *Hampton v. United States, supra,*[16] reversal would be required on due process grounds. *Cf. United States v. Tobias*, 662 F.2d 381 (5th Cir.1981), *cert. denied,* —— U.S. ——, 102 S.Ct. 2908, 73 L.Ed.2d 1317 (1982); *United States v. Briola*, 660 F.2d 763 (10th Cir.1981).

### III

Although we reject appellant's entrapment contention, he correctly argues that the finding of guilt as to the sale of heroin must be reversed for instructional error. In this connection, we observe that, from the outset, the Government proceeded at trial on the premise that appellant willingly sold heroin to McDonald. Contrariwise, the defense sought to establish that appellant had been induced by McDonald to arrange a purchase of heroin from appellant's roommate, Gourdine. Of course, if appellant was himself the seller of the packets, no defense of agency would be raised and no

---

or business, or was about to become so engaged.

Under this advice, if literally adhered to, an entrapment defense would be excluded if the CID agents reasonably suspected appellant of criminal activity, even if he neither was engaged in such activity nor was predisposed to engage in it. Since no one suggested that any-

one suspected Vanzandt, we can assume that the court members disregarded this obviously inapplicable part of the judge's instructions.

16. Justices Powell and Blackmun, concurring in the judgment; Justices Brennan, Stewart, and Marshall, dissenting. Justice Stevens did not participate.

instruction thereon would be required. On the other hand, if the sale was made by Gourdine to McDonald, the defense of agency would not be excluded. The evidence that appellant was doing a favor for McDonald and was making no profit on the transaction—evidence which supported the entrapment defense—also tended to show that appellant had been McDonald's agent for buying the drugs and so could not be convicted of a sale.

The military judge gave no instruction on agency but such an omission would be appropriate only on a premise that appellant sold his own heroin to McDonald, instead of arranging for a sale of heroin which was owned by Gourdine at the time of its purchase by McDonald. However, that very premise was rejected at trial by the military judge; during an Article 39(a)[17] session, he proposed to instruct the court members on the law of principals and, when the defense counsel objected, the judge responded:

> MJ: Alright. I thought perhaps there might be an objection to that. I don't believe that's the prosecution's contention, either, but I felt, as I was listening to the case, that an instruction was necessary from several standpoints, possibly to avoid an unguided finding on the basis of the theory of principals by the court. There's clearly some evidence that the accused was at least there while some drug dealing was going on and the complete instruction in 9–11(a) [of DA Pam. 27–9] contains, among other things, an instruction that

mere presence at the scene is not enough, nor is mere failure to prevent the commission of the offense. I think it's important that the jury know these matters. Accordingly, I will give that instruction over the objection. Any other questions?

Later during his advice to the court members, the judge explained that one "who aids or abets the commission of an offense . . . is equally guilty" thereof, but that the criminal intent must be shared with "the active perpetrator of the crime" and "mere presence at the scene . . . is not" sufficient to establish guilt "as an aider or abetter."

At the end of his instructions, the judge further explained aiding and abetting in response to a court member's question. Among other things he stated: "In this connection I would point out the case does not appear to have been very largely tried on that theory, but there has been some suggestion concerning the matter."[18]

The judge should have instructed on aiding and abetting only if he determined that the evidence was susceptible to the interpretation that Gourdine made the sale to McDonald—of course, with appellant's assistance. However, under that scenario appellant would not be the "owner," and in that event there would not be present the type of transaction which might excuse the omission of an agency instruction.

██ Of course, the defense of agency is available only to one who acts solely for the purchaser.[19] However, as we read the rec-

---

**17.** Uniform Code of Military Justice, 10 U.S.C. § 839(a).

**18.** The "suggestion" seems to have originated with the military judge himself. We can find nothing in the record which, upon our reading, constitutes a "suggestion" from anyone that the judge should instruct on aiding and abetting. However, if the judge believed that the evidence was susceptible of establishing guilt on an aiding-and-abetting theory—and since the Government did not contend that appellant was an aider or abetter, but instead insisted that he was the vendor of the heroin—the judge might wisely have instructed the court members that they could find appellant guilty of the sale only if the evidence convinced them

beyond reasonable doubt that Vanzandt himself made the sale. Such an instruction would have conformed to the theory on which the Government tried the case and yet avoided the risk of an "unguided finding," about which the judge was concerned.

**19.** As a result of amendments to paragraph 213*g* of the Manual for Courts-Martial, United States, 1969 (Revised edition), which took effect October 1, 1982, and make distribution, rather than sale, of drugs an offense, the defense of agency will not be applicable in future drug cases. *See* Executive Order 12383 of September 23, 1982, 47 Fed.Reg. 42317, 42318 (September 27, 1982).

ord of trial—including appellant's confusing testimony—it does not foreclose the contention that appellant was acting solely for the purchaser, McDonald. Indeed, the very evidence which raised the entrapment defense tends to show that appellant was acting solely as agent for the purchaser.[20]

■ In short, if here the judge chose to instruct the court members on the law of principals because of "some suggestion" that appellant had aided and abetted Gourdine in the latter's sale of heroin to McDonald, he also should have instructed on agency. Conversely, if the judge concluded that, under the. circumstances of this case, no instruction on agency was required because all the evidence tended to show that appellant was himself the vendor of the heroin, he should have refrained from instructing on aiding and abetting.

The judge erred either (1) by allowing the court members to convict on a theory not raised by the evidence or urged by the Government, or (2) by failing to advise the court members of a defense which was raised by the evidence. Under either alternative, appellant clearly was prejudiced as to the finding that he was guilty of selling heroin.

## IV

The decision of the United States Army Court of Military Review is reversed as to specification 2 of the Charge and the sentence. The finding of guilty of that specification is set aside. The record of trial is returned to the Judge Advocate General of the Army for submission to that court for reassessment of the sentence based on the remaining finding of guilty or a rehearing may be ordered.

Judge FLETCHER concurs.

COOK, Judge (concurring in part and dissenting in part):

I concur fully in the learned elucidation on the law of entrapment by the Chief Judge as well as with his resolution of the entrapment issue. Where I part company with the majority is with their decision as to the effect of the military judge's instruction on aiding and abetting.

Before faulting the military judge, we should attempt, as much as possible, to view the case through the eyes of the trial participants. The Government called three witnesses during its case-in-chief: the informer and two investigative agents. The testimony of the informer, McDonald, is adequately presented in the majority opinion. Of particular importance is his description of the sale of heroin. McDonald testified that when he entered the accused's room, he saw "four little packets sitting there on the table" and the accused said only, "right there" and inclined his head down and to the left. When McDonald said, "that's small for twenty dollars," the accused said nothing. McDonald then picked up three packets, put down the money, and left the room. He did not see anyone pick up the money. After McDonald's testimony, a court member engaged in the following dialogue with McDonald:

Q. Now, if I recall your testimony, the first time you saw this heroin it was laying on a table of some sort, is that right?

A. Yes, sir. A desk.

Q. A desk. Did you ever see this heroin in—physically in the possession of Vanzandt?

A. No, sir.

Q. Do you know where it came from.

A. No, sir. Not really.

Q. Vanzandt ever say it was his?

A. No, sir.

Q. He just pointed to it?

A. No, sir. He just went "right there" (the witness inclined his head downwards and to the left).

Q. He just nodded and said "right there?"

---

**20.** The entrapment case must be rare where an accused contends that he has been entrapped by an informer or undercover agent into acting as an *agent* for the seller of contraband; if such a case exists, it certainly is not the one at bar.

A. And he was looking at some albums and he said "right there" and I just seen it laying there.

Q. He never picked up the money? You picked up the three packets and put the money down?

A. Yes, sir.

Q. And that was all that was said?

A. Yes, sir.

One of the agents testified that the accused, after proper advisement of rights, "admitted ... that he had sold heroin in early October." The rest of the Government's evidence related to the chemical analysis of the heroin.

It was not until the accused took the stand that it was revealed that he had purchased the heroin from Gourdine and sold it to McDonald. The accused's confusing testimony * also may well have contributed to the military judge's misgivings.

Thus, in my view, there is a sound basis for the military judge's belief that some instruction was necessary to avoid "an unguided finding." It may well be that the instruction might have been better tailored to fit the singular facts, but our test is not whether the trial was perfect but whether an error was committed which "materially prejudices the substantial rights of the accused." Article 59(a), Uniform Code of Military Justice, 10 U.S.C. § 859(a).

The instruction on the agency defense was neither requested nor given. The military judge bears the responsibility for properly instructing the court members on all questions of law and on all potential defenses raised by the evidence irrespective of the requests of counsel. *United States v. Jackson*, 6 M.J. 116 (C.M.A.1979); *United States v. Graves*, 1 M.J. 50 (C.M.A.1975). In performing this responsibility, he must evaluate the evidence of record, *United States v.*

*Rowe*, 11 M.J. 11 (C.M.A.1981), and act on his own initiative to insure the "informed consideration by the court members" of each issue. *United States v. Gaiter*, 1 M.J. 54, 56 (C.M.A.1975). If the defense of agency is reasonably raised, the military judge has a duty to instruct on it. *United States v. Steinruck*, 11 M.J. 322 (C.M.A. 1981); *see also United States v. Griffin*, 8 M.J. 66 (C.M.A.1979); *United States v. Sawyer*, 4 M.J. 64 (C.M.A.1977); *United States v. Stewart*, 20 U.S.C.M.A. 300, 43 C.M.R. 140 (1971). Hence, the question is whether the evidence presented reasonably raised the agency defense.

We have defined the agency defense in *United States v. Fruscella*, 21 U.S.C.M.A. 26, 27, 44 C.M.R. 80, 81 (1971) as follows: "It is a well-established principle of law that one who acts in a given transaction solely as a procuring agent for a person is not a seller to that person." However, the defense is available only if the accused acted as an agent solely for the purchaser and not for the seller. *United States v. Suter*, 21 U.S.C.M.A. 510, 45 C.M.R. 284 (1972). On the basis of the cross-examination of government witnesses by defense counsel (which was directed toward establishing the entrapment defense) it may be fairly said that the agency defense was reasonably raised. However, the testimony of the accused removed any reasonable grounds for both defenses. The accused testified that he paid for the drugs with his own money and was thus, for a brief time, the owner of the drugs. In addition, the accused first mentioned the availability of heroin even though McDonald asked for hashish; the accused found the source of the drugs, a person not mentioned by the informer, *see United States v. Johnson*, 371 F.2d 800 (3d Cir.1967); he brought the drugs to a prear-

---

* Defense counsel's predicament was well stated in his closing argument:

Fact is, he contradicted himself on some questions that the defense went into—the defense went into about sixteen times. Part of that is the fact that he didn't understand the questions. Part of that might be the fact he couldn't remember. Part of that is that he didn't have the guts, maybe, to tell you that

he put CID buy-money in his own pocket. We don't know. But what's interesting to note about the way he testified to you—and I'm sure you all caught this—is a number of times that questions were presented to him by the military judge and by yourself, questions that if he would have answered the right way he would have gotten himself off the hook. But he didn't do that.

ranged place; he offered to sell more than the purchaser wanted; he set the price, *United States v. Winfield,* 341 F.2d 70 (2d Cir.1965); he had closer ties to the source than did the informer; he agreed to act for the source who refused to deal directly with the purchaser; he received the money; and, he gave the money to the source. Considering the totality of the evidence, largely presented by the accused himself, the defense of agency, which was originally viable, was obliterated. I find no obligation of the military judge to *sua sponte* give an unrequested instruction on agency.

I would affirm the decision of the United States Army Court of Military Review.