**UNITED STATES**

v.

**Sergeant Michael E. MASSENGILL, FR 411–98–6644, United States Air Force.**

**ACM 27798.**

U.S. Air Force Court of Military Review.

Sentence Adjudged 14 April 1989.

Decided 10 April 1990.

Appellate Counsel for the Appellant: Colonel Richard F. O'Hair and Captain Bernard E. Doyle, Jr.

Appellate Counsel for the United States: Colonel Joe R. Lamport; Colonel Robert E. Giovagnoni, Major Terry M. Petrie; Major Paul H. Blackwell, Jr., Captain Morris D. Davis and Captain James C. Sinwell.

Before HODGSON, SPILLMAN and PRATT, Appellate Military Judges.

## DECISION

HODGSON, Chief Judge:

A sting operation conducted by the Office of Special Investigations (OSI) at Grand Forks AFB, North Dakota, in the fall and winter of 1988–89, resulted in the appellant being convicted of possessing cocaine with intent to distribute, communicating threats to potential witnesses, and uttering provoking words. The approved sentence is a dishonorable discharge, seven years confinement, total forfeitures, and reduction to airman basic.

In addition to the errors assigned by appellate defense counsel, we specified the following issue:

IS EVIDENCE OF A POSITIVE URINALYSIS FOR THC AND A SUBSEQUENT INVOLUNTARY DISCHARGE FROM THE AIR FORCE FOR DRUG USE, WHICH WERE DECLARED VOID BY THE AIR FORCE BOARD FOR CORRECTION OF MILITARY RECORDS, INADMISSIBLE TO PROVE PREDISPOSITION TO POSSESS COCAINE WITH INTENT TO DISTRIBUTE; OR FOR ANY OTHER PURPOSE?

Both the errors assigned by appellate counsel and the issue specified by this Court warrant discussion.

## I

The record established that in late 1987, the OSI became aware that the appellant was wiring money from the Western Union office on base to its office in Chattanooga, Tennessee, the appellant's home town. Later, almost the identical amount would be wired back. This led the OSI to suspect that the appellant was "laundering" money.

Staff Sergeant Laura Furlong became an OSI informant in mid-October 1988. About two weeks before this she met the appellant at a dance on-base, and they occasionally met for lunch. In late October, during one of these luncheon engagements, the appellant told Furlong that he had been in the military before, but "was kicked out for a drug-related incident." He stated that while he was out, he "[ran] drugs and money for his brother back home."[1] He further indicated that he had been "reinstated back into the military."[2]

After Furlong became acquainted with the appellant, the OSI asked her to see if the appellant would supply her with drugs. While the appellant and she were driving back from lunch, she asked him if any marijuana was available. He replied that he did not deal in marijuana because it was too easily detected and hard to get at "a northern tier base." According to Furlong, the appellant further stated "that the only thing he deals in is cocaine." The subject of cocaine was brought up several times at their luncheon meetings. On occasion he would indicate that a "shipment" was due in and he could let her have an "eight ball" (i.e., ⅛ oz of cocaine) for $300.00. Despite his assurances that he could obtain cocaine, the appellant did not supply any to Furlong during late November and all of December. He gave various excuses for his failure to do so. Once the appellant told her that one

reason he could not supply her drugs was "because he didn't know if he could trust [her]. He wanted to make sure ... because he didn't want to get messed over again." During this period the appellant told Furlong that if she crossed him, he would "take away something you love." This frightened her as she had three small children.

Joseph Arrowood is the husband of an Air Force member stationed at Grand Forks AFB, and has been an OSI informant since mid-August 1988. On 23 November, Arrowood became acquainted with the appellant through a casual conversation at the NCO Club bar. At that time the appellant mentioned that the "word on the street" was that he [Arrowood] was a "dealer." The appellant went on to say that a "dealer" on-base should keep a "low profile" because of the "strict security." The conversation ended with the appellant saying that he and Arrowood would get together later and "talk more."

About a week later, Arrowood and the appellant met again at the NCO Club, and the conversation picked up where it had left off with the appellant pointing out the difference between dealing on the "street," and on a military installation. He identified for Arrowood the axioms that should be followed when operating an on-base drug business. These summarized cardinal rules state:

1) Never give a person drugs or take money from—always use a third party;

2) watch for marked money;

3) send home money that is received as it may be marked;

4) never get high when "dealing;" and

5) if a person is counting money out loud, he is probably wearing a concealed tape recorder.

---

**1.** On direct examination, the appellant testified that his brother had been shot and killed during some type of operation involving the state police.

**2.** On 17 June 1983, the appellant was involuntarily discharged under Air Force Regulation 39–10 because he tested positive for THC, a metabolite of marijuana. The Air Force Board for Correction of Military Records determined,

on 13 April 1987, that the Brooks AFB Laboratory testing procedures involving his test were flawed, and the test results showing the presence of THC in the appellant's urine were invalid. Accordingly, the appellant's records were corrected to show that he had never been discharged and he was reinstated in the Air Force with back pay.

The appellant also indicated that if a transaction is made in a car, there should be no direct exchange. For a proper exchange, both the money and the drugs should be laid on the car seat. The appellant further stated that later on, he "could probably hook [Arrowood] up with two girls who were interested in the same thing" as Arrowood.

On 4 January 1989, while they were returning from lunch, the appellant told Furlong that he was getting some cocaine and the cost would be $300.00. He indicated he was not "dealing" himself, but would tell her where to drop off the money and where to get the drugs. Furlong testified that the appellant never contacted her on 4 January to tell her where to get the cocaine. At lunch the next day, the appellant indicated to Furlong that cocaine was still available. She evidenced an interest, but the appellant never stated how the cocaine could be obtained.

That same day the appellant sought out Arrowood at the NCO Club, and asked him if any cocaine was available. Arrowood said there was, but it would take time to set the "deal" up. Arrowood then told the OSI of the anticipated "buy," and arrangements were made to get the cocaine and take it to the appellant's dormitory room at 1700 the next day; however, the appellant was not in his room on 5 January, and the "buy" never took place.

About a week later, 11 January 1989, the appellant asked Arrowood, "Can you get a hold of an eight ball?" Arrowood said he could and it would cost $310.00. That same day the appellant approached Furlong and told her that an "eight ball" was available for $300.00. She reported the conversation to the OSI. Later that evening the appellant and Arrowood came to Furlong's house where the appellant took the $300.00 that Furlong had been given by the OSI. Arrowood and the appellant then drove to a gas station where they were to meet an undercover OSI agent who had the cocaine. While they were waiting for the individual who had the cocaine to arrive, the appellant expressed concern about the reliability of Arrowood's connection.

When Arrowood indicated that his connection was good, the appellant stated, "If anything happens, I can take care of the situation because I've got my piece right here" referring to a gym bag on the seat between them. Arrowood construed the remark as a threat to shoot him [Arrowood] should anything go wrong. When the undercover OSI agent arrived, the appellant gave Furlong's money to Arrowood, who passed it to the agent, who in turn gave the cocaine to the appellant. Almost immediately thereafter the appellant was arrested by OSI agents. The record established that neither informant, Furlong nor Arrowood, knew that the other was assisting the OSI in an undercover capacity.

Upon arriving at the OSI office, the appellant stared at one of the arresting officers and stated, "I know who your wife is, I know where she works, I know where your family lives." The agent considered the statement a serious threat in light of the manner in which it was said and what was said.

After the proper codal warning and advice as to the right to counsel, the appellant admitted he knew that a drug transaction was going on, but asserted he was not involved. He later acknowledged possessing the cocaine that was seized.

In his testimony, the appellant stated that he had never been involved with drugs and agreed to get cocaine for Furlong out of sympathy after she had asked him to do so 20–25 times. The appellant further stated that when Arrowood asked about drugs, he told him he was not interested. The appellant also maintained that the night he was arrested he had been drinking heavily, and that affected his judgement. He denied asking Arrowood for cocaine, and said that when a small packet was placed in his hand while he was in the car, he immediately dropped it. He further denied threatening the arresting officer's wife and family. He denied ever telling Furlong that he ran drugs during his break in service, and getting $300.00 from her to buy drugs. He said that any money he got from Furlong was a loan repayment. The money orders he wired to his home were child support

payments, and the money sent to him was from his mother out of the back pay he received when he was reinstated in the Air Force.

## II

At trial, the appellant's sole defense to possessing cocaine with intent to distribute was entrapment. This was made clear by his defense counsel from the moment the court was called to order. The appellant's position, both at trial and on appeal, was that the idea of possessing cocaine was first planted in his mind by Furlong and Arrowood who were government informants.

In *United States v. Vanzandt,* 14 M.J. 332 (C.M.A.1982), the Court of Military Appeals observed that the defense of entrapment focuses on criminal intent and the predisposition of the accused rather than the tactics employed by the government agents. Thus, when the criminal design originates in the accused's mind, and the police do nothing more than afford an opportunity for the commission of the crime, the defense of entrapment does not exist. *United States v. Manzella,* 791 F.2d 1263 (7th Cir.1986). Once an entrapment defense is raised, the government must prove the absence of entrapment beyond a reasonable doubt. *United States v. Vanzandt, supra.*

The prosecution may overcome the accused's claim of entrapment by showing a readiness on his part to engage in drug trafficking, or by his conduct and statements during his contact with the government agents that establish he was not an "unwary innocent," but rather an "unwary criminal." *United States v. Andrews,* 765 F.2d 1491 (11th Cir.1985); *United States v. Punch,* 722 F.2d 146 (5th Cir.1983).

Since the defense of entrapment is a factual determination, what evidence was provided the members that tended to establish a predisposition on the appellant's part to traffic in drugs? Furlong testified that the appellant told her at their first meeting that he had "run drugs and money" for his brother during a break in service. Later,

when they became better acquainted, he responded to her question as to the availability of marijuana with the rejoinder that he only dealt in cocaine, because marijuana was too easily detected and hard to get that far north. Arrowood testified that the appellant sought him out because he [Arrowood] had a reputation on the "street" as a drug dealer. During their initial meeting, the appellant urged Arrowood to keep a "low profile" on-base, and later, at a second meeting, gave Arrowood a short indoctrination on how to conduct an on-base drug operation.

All of this shows a predisposition on the appellant's part to deal in drugs. The issue of entrapment was submitted to the members with proper instructions. The evidence supports their conclusion that the appellant was not entrapped. *United States v. Vanzandt, supra.* We reach the same conclusion. Article 66(c), UCMJ, 10 U.S.C. § 866(c); *United States v. Dayton,* 29 M.J. 6 (C.M.A.1989).

Initially, we were concerned that the members may have been improperly informed about the appellant's prior administrative discharge for drug use and his subsequent reinstatement in the Air Force. We specified this issue and requested briefs.

After further consideration, we hold, that under the facts of this case, the evidence was properly admitted. It was the appellant who disclosed the situation in a conversation with an informant—apparently to enhance his credibility as an individual who knew his way around the drug culture. In such a situation, evidence of his prior use was clearly admissible. We leave for another time whether extrinsic evidence of an administrative discharge for drug abuse and subsequent voiding of that action would be admissible. Mil.R.Evid. 404(b); *See generally United States v. Dowling,* 855 F.2d 114 (3d Cir.1988) (evidence that accused was acquitted in an earlier robbery inadmissible in a bank robbery prosecution); *cf. United States v. Rocha,* 553 F.2d 615 (9th Cir.1977) (evidence that accused acquitted of transporting marijuana admis-

sible in trial for possessing marijuana with intent to distribute).

## III

 The appellant moved to suppress statements made by him the evening he was arrested. The trial judge, in detailed findings of fact, concluded that the appellant was given the proper warnings and advised of his right to counsel. The prosecution, of course, had the burden of proving that the appellant knowingly and voluntarily waived his right to remain silent and to the assistance of counsel. Mil.R.Evid. 304(e). We are convinced this burden was met. The trial judge saw and heard the witnesses offered on the motion to suppress. We find nothing in the record of trial to warrant setting aside his ruling. *United States v. Forbes*, 19 M.J. 953 (A.F.C.M.R.1985).

## IV

In Specification 4 of Charge II, the appellant is alleged to have threatened Mr. Arrowood by indicating that he [appellant] had a weapon in a gym bag which he would use should the need arise. Arrowood considered this statement as a threat that the appellant would shoot him if anything went wrong.

The appellant's statement, although threatening, is ambiguous as to the person being threatened. It could easily have meant that the appellant would shoot a third party trying to interfere with the scheduled drug transaction. We are not convinced beyond a reasonable doubt that Arrowood was threatened by the appellant. Article 66(c), UCMJ. For this reason, Specification 5 of Charge II is dismissed. We reassess the sentence in our decretal paragraph.

## V

The remaining errors are resolved against the appellant. *United States v. Sells*, 3 U.S.C.M.A. 202, 11 C.M.R. 202 (C.M.A.1953); *United States v. Dilday*, 47 C.M.R. 172 (A.C.M.R.1973).

In light of our dismissing Specification 5 of Charge II, we find appropriate only so much of the approved sentence as provides for a dishonorable discharge, six years confinement, total forfeitures, and reduction to airman basic. The findings of guilty and the sentence, both as modified, are

AFFIRMED.

Judges SPILLMAN and PRATT concur.