UNITED STATES, Appellee,

v.

Ronald R. BRETZ, Sergeant U.S. Army, Appellant.

No. 45108.
SPCM 17215.

U.S. Court of Military Appeals.

Feb. 19, 1985.

For Appellant: *Captain Peter D.P. Vint* (argued); *Colonel William G. Eckhardt, Captain Michael T. Kelly, Captain Peter R. Huntsman* (on brief); *Lieutenant Colonel Arthur L. Hunt, Major Robert C. Rhodes, Major Robert M. Ott, Captain Peter L. Yee, Captain Thomas J. Feeney.*

For Appellee: *Major Thomas J. Leclair* (argued); *Colonel James Kucera, Lieutenant Colonel John T. Edwards, Captain Andrew D. Stewart, Captain Richard J. Fadgen* (on brief). *Colonel R.R. Boller* and *Major Michael R. Smythers.*

*Opinion of the Court*

EVERETT, Chief Judge:

A special court-martial sitting at Camp Hovey, Korea, tried the accused for the possession, sale, and transfer of marihuana on June 3, 1981, in violation of Article 134, Uniform Code of Military Justice, 10 U.S.C. § 934. Contrary to his general pleas of not guilty, the accused was convicted of the possession and sale offenses; and the

court-martial sentenced him to a bad-conduct discharge, confinement at hard labor for 4 months, and reduction to the grade of Private E–1. The convening authority approved the findings and sentence; and the United States Army Court of Military Review, by divided vote, affirmed. We granted Bretz' petition for review on these two issues:

## I

WHETHER A SALE OF MARIHUANA CAN OCCUR, WHICH RENDERS THE ACCUSED LIABLE AS A PRINCIPAL, WHEN THE ONLY PARTIES PRESENT ARE TWO GOVERNMENT AGENTS, AND THE ALLEGED SALE OCCURS WHEN ONE GIVES THE MARIHUANA TO THE OTHER.

## II

WHETHER THE MILITARY JUDGE ERRED BY NOT INSTRUCTING THE MEMBERS ON THE LAW OF AIDING AND ABETTING REGARDING THE SPECIFICATION ALLEGING SALE OF MARIHUANA.

## I

Specialist Four John Breitbach testified that in April 1981 Bretz "asked if I would sell dope for him." Thereafter, Breitbach "started working for him, meeting him off-post. He would give me the dope; I'd take it on the compound, or wherever, to sell to individuals." According to Breitbach the business relationship developed further. "After about 3 weeks, he gave me a key to his hooch and told me I didn't need to go through him anymore, just go to the hooch and get it, whenever I needed it, then contact him and notify him of how much I took." The hooch was located in a nearby Korean village. Bretz had given Breitbach the key so that "I could just go down there and get it whenever I need it, take it and sell it for him." In accord with this arrangement, from time-to-time Breitbach "went into the hooch, went to the Korean wall cabinet, got the dope out of the wall cabinet, locked up the hooch again, took it to wherever I was going to meet somebody." Whenever he picked up "dope"—marihuana—from the hooch, Breitbach "became indebted" to Bretz "until I met with him either that night or the next day to pay him off." The marihuana in the hooch was packaged in small bags; and the bags were sold for $20 to $40 each, the price depending on the size of the bag.

After he made a sale to an undercover agent of the Joint Drug Suppression Team, Breitbach was apprehended on June 2, 1981, for wrongful possession and sale. On June 3, after discussion with his company commander, he decided to cooperate with the investigators. "They asked me to set up a deal to buy off of Sergeant Bretz and I told them I didn't have to, that I had a key to his hooch, that I could get any amount of dope out of there ... anytime I wanted to." Then he

> and Special Agent Driscoll went down to Sergeant Bretz' hooch, and we both went inside .... I went to the cabinet while Special Agent Driscoll stood by the door. I went into the cabinet, got the marihuana and handed it to Special Agent Driscoll. We left, we went back to MPI—CID Office and at that time they asked me to contact Sergeant Bretz.

Breitbach had picked up nine bags of marihuana which he handed directly to Agent Driscoll, and they went back to the CID Office with the bags. Later that day he contacted the accused, and they arranged to meet that evening. However, Bretz failed to appear; and later the accused told Breitbach that, instead of making a lump sum payment for the marihuana that he had picked up at the hooch, he should mail it to the accused in $20 and $40 sums. However, none of that money was mailed because Bretz "told me later on not to worry about it that it was a loss, that he thinks that the CID Agents have me—have his dope and that I was the one who gave it to them."

After the Government rested its case, the defense offered evidence that Bretz

had been away on leave during part of April and May and that Breitbach was a person of untruthful character. The defense theory was that he was implicating Bretz in order to get more favorable treatment for himself from law enforcement authorities.

Prior to final arguments, the military judge reviewed with counsel the instructions he planned to give. Neither trial nor defense counsel had any objection to the manner in which the judge planned to explain their respective theories of the case. Subsequently in instructing the court members, the judge explained that the specifications alleging transfer and sale were multiplicious; and that Bretz could not be found guilty of both. Thereafter, he advised them:

> MJ: Basically, the theory of the case, as far—as the government is concerned, is that the accused was in the business of selling marihuana. That, he had established a way of doing business in which Specialist Breitbach acted as his agent, would pick up marihuana from the accused's room whenever he had a sale; that, the accused had, in fact, given him a key to that room; Breitbach would go to the room, pick up whatever amount of marihuana that was to be sold, sell it, and then give the proceeds—or pay the accused at a later date. That on the 3rd of July—excuse me, the 3rd of June 1981, what occurred was basically a following of that normal course of business as established by the accused. CID was purchasing marihuana from the accused; this was accomplished by Specialist Breitbach going to the accused's room; utilizing the key given to him by the accused, obtaining the marihuana which was then transferred to the CID agents. The defense's contention is that there never was any sale or transfer; that basically Breitbach is in court today lying; no money was given to the accused; the accused knew nothing of a transfer or sale; and that the only knowledge the accused had of any marihuana was at the time that Breit-

bach had brought marihuana into his premises and he had told him to remove it from his premises; that there was no knowing conscious possession of marihuana on the part of the accused at that time; and that, during some of these dates that Specialist Breitbach testified to meeting the accused during April that the accused was, in fact, on leave and was out of the country. This was placed before the panel by Defense Exhibit A, the accused's leave form, and testimony from Specialist Turner. So, the defense theory is it never happened, and Breitbach is fabricating this story to save his own hide.

There were no objections to these instructions. When the court closed to deliberate, it took only twenty minutes for the members to reach their findings.

## II

■ Article 77 of the Uniform Code, 10 U.S.C. § 877, provides:

> Any person punishable under this chapter who—
>
> (1) commits an offense punishable by this chapter, or aids, abets, counsels, commands, or procures its commission; or
>
> (2) causes an act to be done which if directly performed by him would be punishable by this chapter;
>
> is a principal.

Under some circumstances, a person who supplies the drugs that are sold by someone else may be convicted of the sale as an aider or an abettor under Article 77(1). However, the Government did not prosecute the accused as an aider and abettor. Instead, its premise was that Bretz had caused the sale of the marihuana by Breitbach and so was liable under Article 77(2).

■ In criminal cases, as well as civil, "[i]t is a well recognized principle that the act of an agent with the knowledge and consent of the principal is the act of the principal." *Morgan v. United States*, 149 F.2d. 185, 187 (5th Cir.), *cert. denied*, 326

U.S. 731, 66 S.Ct. 39, 90 L.Ed. 435 (1945) (footnote omitted). *See also United States v. Deaton,* 563 F.2d 777 (5th Cir. 1977), *cert. denied,* 435 U.S. 917, 98 S.Ct. 1475, 55 L.Ed.2d 510 (1978). Therefore, when an agent acts with the knowledge and consent of his principal, it can be said that the principal "caused" the act. Thus, in construing 18 U.S.C. § 2—which conforms to Article 77 of the Uniform Code—a court of appeals pointed out:

> The courts have uniformly construed the word "cause" ... to mean *a principal acting through an agent* or one who procures or brings about the commission of a crime. One acting in such capacity is chargeable as a principal in the crime and punishable accordingly.

*United States v. Inciso,* 292 F.2d 374, 378 (7th Cir.), *cert. denied,* 368 U.S. 920, 82 S.Ct. 241, 7 L.Ed.2d 135 (1961) (emphasis added). *See also United States v. Levine,* 457 F.2d 1186, 1188 (10th Cir. 1972).

■ According to Breitbach's testimony, he was the agent for Bretz in selling marihuana which was kept at the accused's hooch; and he had been given broad authority to conduct this business. However, we doubt that his authority as agent included making a sale to a prospective buyer whom he knew to be a law enforcement agent. Certainly Bretz did not intend to authorize Breitbach to make sales that would lead directly to the destruction of the business. Indeed, at the time of the purported sale, Breitbach really had ceased to be Bretz' agent and had become an agent for the Government. Furthermore, Bretz did not ratify the sale at a later time, since he declined to receive any proceeds from the sale.

An even more basic difficulty in the Government's case was highlighted by the dissenting judge in the court below when he implicitly asked, "Where's the sale?" According to Breitbach, the "sale" took place at the hooch when he delivered the marihuana to a law enforcement agent. However, at that time the Government was in a position readily to seize the contraband; and there was no need to buy the marihuana, which for all practical purposes already was under the Government's control.

In our view this transaction—even if technically classified as a "sale"—is not within the coverage of the punitive Articles of the Uniform Code. In this respect, the situation is akin to that which exists when someone has been entrapped into taking action which usually would constitute a crime. There, as Chief Justice Hughes pointed out in the seminal case of *Sorrells v. United States,* 287 U.S. 435, 446, 53 S.Ct. 210, 214, 77 L.Ed. 413 (1932), statutes should not be interpreted literally "at the expense of the reason of the law and producing absurd consequences or flagrant injustice." The majority opinion in *Sorrells* then explained:

> We are unable to conclude that it was the intention of the Congress in enacting this statute that its processes of detection and enforcement should be abused by the instigation by government officials of an act on the part of persons otherwise innocent in order to lure them to its commission and to punish them. We are not forced by the letter to do violence to the spirit and purpose of the statute.

*Id.* at 448, 53 S.Ct. at 215. *See also Sherman v. United States,* 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *United States v. Vanzandt,* 14 M.J. 332 (C.M.A. 1982). Unlike *Sorrells,* Bretz had a criminal intent which preceded any action or inducement by law enforcement agents. However, just as in *Sorrells,* the "sale" here was "the product of the creative activity of ... [government] officials." 287 U.S. at 451, 53 S.Ct. at 216. In view of all the circumstances, we conclude that this transaction falls outside the intent of the Uniform Code.

Furthermore, since the Government prosecuted Bretz under Article 134, it was required to establish that the "sale" was service-discrediting or contrary to good order. However, under the circumstances here, the transaction did not affect either

the reputation or the discipline of the armed services. For this reason, too, a finding of not guilty should have been entered with respect to the allegations that Bretz wrongfully sold marihuana.*

### III

 Since the Government did not rely on the aiding-and-abetting theory of the law of principals, there was no occasion for the judge to instruct the court members on this subject. Although the judge did not specifically refer to Article 77(2), his instructions on principal and agent adequately informed the court members of the Government's theory of the case—especial-

* On grounds of multiplicity and pursuant to the judge's instructions that they could not convict of both sale and transfer, the court members acquitted Bretz of transfer of the marihuana. However, if a finding of guilty had been re-

ly since neither side objected or requested additional instructions.

### IV

The decision of the United States Army Court of Military Review is reversed as to specification 2 of the Charge and the sentence. The finding of guilty of specification 2 is set aside and that specification is dismissed. The record of trial is returned to the Judge Advocate General of the Army for remand to the Court of Military Review for reassessment of the sentence in light of this opinion.

Judge COX concurs.

Judge FLETCHER did not participate.

turned as to this offense, it would have suffered from the same infirmity. On the other hand, the conviction of wrongful possession is clearly sustainable.