**UNITED STATES, Appellee,**

v.

**Stephen P. DAYTON, Specialist Four,
U.S. Army, Appellant.**

No. 59,553.
CM 8600118.

U.S. Court of Military Appeals.

Sept. 19, 1989.

For Appellant: *Captain Gregory B. Upton* (argued); *Colonel John T. Edwards, Lieutenant Colonel Russell S. Estey, Major Kathleen A. VanderBoom* (on brief); *Captain Kevin T. Lonergan.*

For Appellee: *Captain James K. Reed* (argued); *Colonel Norman G. Cooper, Captain Gary L. Hausken, Captain Randy V. Cargill* (on brief); *Lieutenant Colonel Gary F. Roberson, Major Daniel J. Dell'Orto, Captain Cynthia M. Brandon.*

*Opinion of the Court*

EVERETT, Chief Judge:

A general court-martial composed of officers tried Dayton at Fort Ord, California,

for wrongfully distributing 20 individual dosage units of lysergic acid diethylamide (LSD) on or about October 24, 1985, and for wrongfully using marijuana on two other occasions. *See* Art. 112a, Uniform Code of Military Justice, 10 USC § 912a.[1] Appellant pleaded guilty to wrongful use but not guilty to distribution. The court-martial found him guilty as charged and sentenced him to a bad-conduct discharge, 2 years' confinement, total forfeitures, and reduction to pay grade E–1. The convening authority approved the sentence; and the Court of Military Review affirmed in a short-form opinion. Thereafter, we granted review to consider two issues concerning the military judge's instructions to the court members.[2]

I

Specialist Four John Radik, the first government witness, testified that he "act[ed] as a confidential source for the Fort Ord Drug Suppression Team in October and November of" 1985. In that connection, on October 23 he met Specialist Wright, a member of that team; and later that day, he entered Dayton's room, where a conversation was taking place about drugs. During this conversation, Dayton said "[t]hat he was able to get ahold of some LSD, and also that he had contacts in Santa Cruz." When Radik "asked if he could get some LSD for a friend of mine that wanted to buy some," Dayton responded that he could get it from Mrs. Benford. When Radik inquired "if Mrs. Benford may be able to front the drugs," Dayton answered that he would "have to phone and check with that." Appellant also had "mentioned that" Mrs. Benford "was selling ... [LSD] for 3 to $4.00 a hit, and that the more you bought the cheaper it would be."

At about 6:15 p.m. Radik called up Agent Wright and scheduled an appointment for noon the next day. Thereafter, he went out to Mrs. Benford's house, where Dayton and several others were present. While he was there, Mrs. Benford got some LSD out of her purse and gave it to Dayton, who in turn delivered it to Radik. Radik counted the 20 individual units of the drug and then "handed it back to" Dayton.

Pursuant to prearrangement, Radik and Dayton met Agent Wright at noon on October 24. Wright's car was parked in a parking lot when Radik and Dayton arrived. Radik positioned his pickup truck in such a manner that Dayton, who "was in the passenger seat," was "right next to" Wright. After Radik had introduced the other two men, he saw "that Dayton was pulling the LSD out of his pocket and was handing it to Officer Wright." A conversation then ensued about "[f]uture drug transactions," during which Dayton "was speaking in terms of LSD and purchasing larger quantities, and the more that you bought, the more money that could be made off of it." As far as Radik knew, Mrs. Benford had received all the money paid by Wright.

Specialist Four Joseph Scott Wright testified that he "work[ed] as an undercover agent on the Drug Suppression Team, and mostly conduct[ed] controlled buys from other soldiers in the Army." On October 23, he had talked with Specialist Radik about "set[ting] up a controlled purchase between Specialist Dayton and myself for the fol-

---

1. A specification alleging wrongful possession of a cigarette containing marijuana was dismissed when some of its allegations were consolidated into one of the specifications alleging wrongful use. *Cf. United States v. Sorrell*, 23 MJ 122 n. 1 (CMA 1986).

2.

I

WHETHER THE MILITARY JUDGE ERRONEOUSLY FAILED TO RECOGNIZE THAT THE DEFENSE OF OBJECTIVE ENTRAP-

MENT WAS FAIRLY RAISED BY THE EVIDENCE AND THEN ERRONEOUSLY FAIL[ED] TO RULE AND INSTRUCT ON THIS DEFENSE.

II

WHETHER THE MILITARY JUDGE ERRED BY INSTRUCTING THE MEMBERS ON THE GOVERNMENT'S THEORY OF AIDING AND ABETTING AS TO SPECIFICATION 1 OF THE CHARGE (WRONGFUL DISTRIBUTION OF LSD) BECAUSE THAT INSTRUCTION WAS NOT LEGALLY WARRANTED.

lowing day." At about noon on October 24, Wright had parked his Pontiac Firebird in the parking lot; and Radik pulled alongside in his large, blue truck, "so that my driver window was facing the passenger window of the truck."

Wright was introduced to Dayton, who was on the passenger side. "Then I asked Dayton if he had the LSD for me. Dayton said he did and I asked to see it." Thereupon, Dayton "reached into his left breast pocket of his BDU's and retrieved a cellophane wrapper, containing 20 individual dosage units of LSD and handed them to me." Wright then gave Dayton "$50.00 in CID funds"; and there was conversation with "Dayton about purchasing a larger quantity of LSD." Wright had not seen Radik "handle or possess the" drug "[a]t any time during that transaction." Wright also identified the LSD which he had received from appellant. Wright conceded on recross-examination that he could not "tell if Radik handed the LSD to Dayton" or "if Dayton handed the $50.00 back to Radik."

Mrs. Benford testified as a defense witness that, in preparation for her husband's permanent change of station, she had been "clearing" their quarters on the evening of October 23; and Dayton and two other soldiers, Talbot and Green, were present. "Radik had come in and" she "had taken 20 hits of acid out of my purse and ... handed it to Radik." He had given her $20 or $25; and "[h]e was to pay me the remaining amount the following day, which he had." She had seen Radik "a couple of times before" this but did not "know him personally." She was rather "surprised to see him there." However, "I had the impression he might be stopping by."

On cross-examination Mrs. Benford acknowledged that she was testifying under a grant of immunity and that Dayton was "a pretty good friend" and had "been over to" her house "[q]uite a few times." Moreover, she had "distributed marijuana to" him "[f]our or five times." Dayton had told her that Radik "might be dropping by ... to pick up what I had"; and so she was "expecting him ... somewhat, to a certain extent." Mrs. Benford also had distributed marijuana on numerous occasions to Private Talbot and Private Green—who were scheduled to testify as defense witnesses. Dayton had been with Radik the next day when Mrs. Benford had received "the rest of" the payment due for the LSD; but "nothing went through ... [Dayton's] hands."

Under questioning by the judge, Mrs. Benford asserted that she had never used LSD with Dayton or sold it to him and that he did not "touch it, hold it, look at it, inspect it" on October 23. However, as she conceded on recross-examination, before the transaction with Radik, she had told appellant that she "had the 20 hits of LSD." She had "just spread the word" to Dayton and others that she "wanted to get rid of it."

Private First Class Mark Anthony Talbot testified that, on the evening of October 23, he and Dayton had been painting at Mrs. Benford's house when Radik walked in and received some LSD from her. "He asked her if she had any; she got her purse; brought it out—got it out of her purse; gave him the acid, and he gave her some amount of money." On cross-examination, Talbot admitted that Mrs. Benford had distributed drugs to him "countless" times. Moreover, he and Dayton had smoked marijuana together at least eight times—once at Mrs. Benford's house.

Appellant testified that on the afternoon of October 23, he had gone to Mrs. Benford's "house to help her clear housing because her husband was PCSing and she was going home." He and Talbot were painting when Radik came in; and "he asked her if she had some acid that he could buy from her." Radik then purchased "20 hits" and made a part payment, the rest to be paid the next day. According to appellant, he never handled the LSD.

On October 24, he and Radik were eating lunch; and Radik had "said he wanted me to go meet his buddy from 127th Signal." He and Radik had pulled into a parking lot alongside Agent Wright's car, where Day-

ton "was in between them." Appellant continued:

Then the next thing I know, he pulled out—he backed in next to him and he introduced us and I said hi to the guy and shook his hand. Specialist Radik took the acid out of his pocket and then Agent Wright asked me if I had the LSD. And Radik said it was here and he handed it to me and I handed it to the other guy. I never said yeah, I got it, or whatever. And he handed me the money and I handed the money to Radik. That was the only time that I touched it at all.

Appellant testified that he had not realized a drug transaction would occur until they had "backed in next to him and he took it out of his pocket." Then he and Radik had gone to where Mrs. Benford was and Radik had "paid her the rest of the money that he owed her at that time." On cross-examination, Dayton admitted that on October 23, Radik had "asked me if I had any LSD for him, and I informed him that I did not" but that he had "told him to check with Mrs. Benford." Radik "did not inform me that those drugs were going to anybody other than himself." Appellant conceded that Mrs. Benford had informed him that she had some LSD, "not to necessarily go around spreading the word that she had it. Just that if anybody asked me to, you know, let them know to check with her."

He had "informed Mrs. Benford that Specialist Radik might stop by." She was not someone who "would sell drugs to anybody that walked into her house"; but because Dayton, Talbot, Green, and Radik "had all known each other" well, "I guess she figured that she knew us well enough to know him." Moreover, Dayton had "smoked marijuana with" Talbot, Green, and Mrs. Benford. Dayton denied that he had told Agent Wright that he had a source for large quantities of LSD. According to appellant, he had no prior knowledge that Radik would sell drugs to Agent Wright; but "[i]t didn't really shock me." He had gone with Radik "to give" Mrs. Benford "the rest of the money that he owed her,"

because Dayton "want[ed] to say good bye to her." Appellant claimed that he had been "set up" by Radik, who was trying to get into the good graces of the Criminal Investigation Command.

In his final argument, trial counsel contended that Dayton was guilty of LSD distribution on either of two theories. If Radik's testimony were accepted by the members, then Dayton was a principal in distributing the LSD to Wright on October 24. Alternatively, even if the defense evidence were accepted as true, Dayton had aided and abetted Mrs. Benford in distributing the 20 hits of LSD. However, after the arguments had concluded, the military judge noted that Dayton was "charged with distributing 20 hits on" October 24, so "[t]he thrust of" the Government's "charge, essentially, is distributing to Wright." Thus, when trial counsel talked about Dayton's guilt as an aider and abettor of Mrs. Benford in distributing to Radik, the abetting was of an earlier offense, rather than of "the ultimate distribution to Wright." The military judge explained to trial counsel that "you may have two separate offenses and you're trying to treat them as one." The judge then inquired if the Government's position was that the distribution to Radik was part of "a continuous act" of distributing to Wright; and he received an affirmative answer.

In instructing the members, the military judge explained that the Government's "first theory" was that on October 24, 1985, Dayton had "simply distributed LSD out [of] the pick up window of Radik's truck to Agent Wright. As simple as that."

The judge continued:

The alternate theory they have is that the accused acted as a principal, being that commencing on the evening prior, the 23d, he assisted or induced or in some manner associated himself with the lady who was his principal supplier of the LSD, caused the accused, in some manner to come to the house—or Radik to come to the house, in some manner, to pick up the LSD and associated in the

transfer of distribution to Radik. And then following on, he further associated himself with the transfer of the LSD from Radik to Agent Wright; therefore, adopting this as something that he intended to further or wanted to further to achieve the distribution of the LSD. Now, if I understand their alternate theory, you're advised that any person who actually commits an offense is a principal. That would apply to the first theory. Anyone who knowingly and willfully aids, or abets another into committing an offense is also a principal and equally guilty of the offense. That would apply to their second the[ory]. An aider or abettor must knowingly and willfully participate in the commission of the crime as something he or she wishes to bring about, and must aid, encourage or incite the person to commit the criminal act. Presence at the scene of a crime is not enough, nor is failure to prevent the commission of an offense. There must be an intent to aid or encourage the persons who commit the crime.

Subsequently, the military judge discussed entrapment, which he advised the members had been "raised as a defense" with respect to wrongful distribution and its lesser-included offense of wrongful possession. He stated:

Entrapment is a defense when government agents, or people cooperating with them, cause an innocent person to commit a crime which otherwise would not have occurred. The accused cannot be convicted of the offense of distribution or possession of LSD if he was entrapped.

As to an innocent person, an innocent person is one who is not predisposed or inclined to readily accept the opportunity furnished by someone else to commit the offense charged. It means that the accused must have committed the offense charged only because of inducements, enticements, or urgings by the representative of the Government. You should carefully consider and not[e] that if the person has the predisposition, if he has the inclination, or if he has the intent to

commit the offense, or is already involved in unlawful activity which the Government is trying to uncover, the fact that an agent provides opportunities, facilitates or assists in the commission, does not amount to entrapment. You should be aware that law enforcement agents can engage in trickery, they can provide opportunities for criminals to commit offenses, but they cannot create criminal intent in otherwise innocent persons, and thereby cause criminal conduct.

The defense of entrapment exists if the original suggestion and initiative to commit the offense or offenses originated with the Government, not the accused, and the accused was not predisposed or inclined to commit the offense of distribution or possession. Thus, you have to balance the accused's resistance to temptation against the amount of government inducement. The focus is on the accused's latent predisposition, if any, to commit the offense or offenses which is triggered by the government inducement. You are further advised that the latitude given the Government in inducing the criminal act is considerably greater in contraband cases than would be permissible in other crimes. In deciding whether the accused, Specialist Dayton, was entrapped, you must consider all the evidence which has been presented to you on this matter. Entrapment is a complete defense. The burden of proof to establish the guilt of the accused is upon the prosecution. You must be convinced beyond reasonable doubt that the accused was not entrapped. Now, the fact that the accused may have possessed or used marijuana or any other controlled substance previously does not establish his predisposition to distribute LSD. The fact that the accused used marihuana with friends does not defeat the defense of entrapment in the distribution of a large quantity of LSD.

Later, at the insistence of defense counsel—who contended that Dayton might be improperly convicted if the court members concluded that he had "aided and abetted a

distribution between Mrs. Benford and Specialist Radik"—the military judge gave this additional instruction:

Now, as to the principal theory, the principal theory of the Government—and this is the one which you must follow—is that this principal theory was a two-step process; step A being the accused assisting, aiding and abetting in the distribution to Radik with an expected subsequent step B aiding, abetting, and assisting in the distribution to Wright. The whole principal theory encompassing two steps, from Mrs. Benford to Radik to Wright, and not—and you may not convict the accused of an offense merely involving Radik and Mrs. Benford. It's got to encompass the entire aiding and abetting to get to Wright.

Does that put it in perspective the way you agree, Counsel?

TC: Sir, the individual that was receiving—it wouldn't necessarily have to be his specific intent to distribute to Wright, but just a friend of the ——

MJ: Well, to some third person. He may not have known it was Wright, but to a third person.

After the court members deliberated for 20 minutes, they found appellant guilty as charged.

## II

■ Appellate defense counsel contend that the military judge should have instructed the court members on the "defense of objective entrapment." However, our Court—like the Supreme Court, *cf. Sherman v. United States*, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848 (1958); *Sorrells v. United States*, 287 U.S. 435, 53 S.Ct. 210, 77 L.Ed. 413 (1932)—has rejected this defense. *United States v. Clark*, 28 MJ 401 (CMA 1989); *United States v. Vanzandt*, 14 MJ 332 (CMA 1982). Thus, court-martial members are to be advised only on "subjective" entrapment—which focuses on the intent of the accused and on whether he had a predisposition to commit a crime or whether, instead, the crime resulted from the creative activity of government representatives.

■ Judge Noble instructed flawlessly in this regard. Moreover, because of the evidence about Dayton's use of marijuana and other controlled substances, he properly advised the court members that possession or use of a controlled substance does not establish a predisposition to distribute it. *See, e.g., United States v. Venus*, 15 MJ 1095 (ACMR 1983).

As we understand the doctrine of objective entrapment, its concern is with the elimination of undesirable police practices, rather than with the accused's state of mind or predisposition. Accordingly, in jurisdictions which recognize objective entrapment, its existence is determined by the judge and is not a "jury question"; [3] and so there is no occasion to give jury instructions about objective entrapment. Thus, even if military justice recognized the doctrine, a military judge would not instruct court members thereon.

■ As we noted in *United States v. Clark, supra,* the Supreme Court has indicated that some police practices intended to induce or encourage criminal activity might be so outrageous as to require dismissal of criminal charges on due-process grounds. Like objective entrapment, due-process violations are for the judge to determine—not the jury. Therefore, even if the conduct of the Drug Suppression Team at Fort Ord were in some way considered to raise a due-process issue, this would be for the military judge—rather than the court members—to resolve, and so would not require instructions.

■ Even under the doctrine of subjective entrapment, the evidence may be sufficient to establish that the Government induced the defendant's allegedly criminal conduct and that he had no predisposition to engage therein. The Supreme Court found this to be true in both *Sherman* and *Sorrells*. In such instances, the military judge should dismiss the charges; and so

---

3. On this issue, the defendant, rather than the prosecution, bears the burden of proof.

**12**

there will be no occasion to instruct the court members on entrapment. However, clearly this was not true here. Dayton was not badgered by Radik into distributing the LSD. Instead, when Radik mentioned to him that he had a friend who wanted to buy some LSD, appellant immediately responded by suggesting that he go to Mrs. Benford's house. Even on appellant's own testimony, the evidence as to his predisposition is so clear as virtually to eliminate any entrapment defense.

### III

Appellant has presented a plausible argument that the military judge should not have instructed the members on aiding and abetting. His argument relies on a distinction between a distribution by Mrs. Benford to Radik on October 23 and a subsequent delivery of the LSD by Radik to Wright the next day.

█ Apparently, appellant would concede that, as trial counsel argued at one point, the evidence was very strong that appellant aided and abetted the distribution which the defense claims took place on October 23. Dayton was trying to help his friend, Mrs. Benford, "get rid of" her remaining supply of LSD before she left Fort Ord. He directed Radik to her house and was, himself, present when the delivery was made. Indeed, if Dayton's own testimony is accepted as credible, he made almost a judicial confession to having aided and abetted Mrs. Benford in wrongfully distributing the 20 units of LSD to Radik.

The military judge, however, perceived a possible problem of variance if the court members were allowed to find Dayton guilty on the basis of his having aided and abetted in this initial distribution. The specification alleged a distribution "on or about October 24"; and the judge observed that the "thrust of" the Government's charge was a distribution to Wright—

which took place on the 24th, rather than that on the 23d. Obviously, Judge Noble was concerned that in some way the defense might have been misled; and, in view of that concern, he attempted to make clear to the court members that they should not find appellant guilty solely because he had aided and abetted Mrs. Benford in distributing the LSD to Radik.

As the judge undoubtedly perceived, a potential problem also existed if the court members were allowed to find appellant guilty on the theory that he had aided and abetted Radik on October 24 in distributing the LSD to Wright. In this instance, even though Dayton was only a conduit for the LSD—which Radik handed to him and he, in turn, handed over to Wright—as well as for the money which Wright paid for the drug, the distribution might be viewed as made by one government representative to another—conduct which is not a crime. *Cf. United States v. Bretz,* 19 MJ 224 (CMA 1985).[4]

The military judge concluded that, even if the members accepted appellant's version of events that Radik had taken possession of the LSD on October 23 and, in turn, had redelivered it to Wright on the 24th, it still would be appropriate to view the two deliveries as part of a "distribution" of the LSD by Mrs. Benford to Wright. In short, the substance, not the form, of the transaction should govern; and here this was a "distribution" by Mrs. Benford to Wright, Radik being only an intermediary.

We find no flaw in this approach which creates no problem of variance. Moreover, just as appellant's testimony was almost a judicial confession to having aided and abetted Mrs. Benford in distributing to Radik, it tended to prove that he had aided and abetted the underlying transaction of wrongful distribution from the source, Mrs. Benford, to the ultimate purchaser, Agent Wright.

4. We doubt, as Judge Noble probably did, whether a servicemember can aid and abet a wrongful distribution of drugs by A to B, both of whom are government agents. However, we need not decide whether being a conduit under such circumstances is sufficient to authorize conviction as a principal. In *Bretz,* the accused was not in actual possession of the controlled substance while it was in the process of being transferred from A to B.

■ The Government was entitled to prosecute appellant on the alternate theories that he was guilty as a principal or as an aider and abettor. *Cf. United States v. Jefferson*, 22 MJ 315, 326–28 (CMA 1986). The military judge painstakingly tailored his instructions to present these theories; and he fully protected appellant's rights.[5] The evidence, including the defense evidence, fully demonstrated that appellant was guilty as charged.

## IV

The decision of the United States Army Court of Military Review is affirmed.

Judges COX and SULLIVAN concur.

---

5. We note with approval that Judge Noble monitored carefully the attentiveness of the court members and, when he believed that one might be sleeping during the trial, he promptly excused him for cause.