# UNITED STATES AIR FORCE COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39817**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Zachary W. ROTHE**
Captain (O-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 24 March 2021

————————————

*Military Judge:* Mark F. Rosenow.

*Approved sentence:* Dismissal. Sentence adjudged on 12 April 2019 by GCM convened at Ellsworth Air Force Base, South Dakota.

*For Appellant:* Major Benjamin H. DeYoung, USAF; Emmanuel V. Tipon, Esquire.

*For Appellee:* Lieutenant Colonel Brian C. Mason, USAF; Major Dayle P. Percle, USAF; Mary Ellen Payne, Esquire.

Before MINK, KEY, and ANNEXSTAD, *Appellate Military Judges*.

Judge ANNEXSTAD delivered the opinion of the court, in which Senior Judge MINK and Judge KEY joined.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 30.4.**

————————————

ANNEXSTAD, Judge:

A general court-martial composed of officer members convicted Appellant, contrary to his pleas, of two specifications of attempting to commit a lewd act on a child under the age of 16 years in violation of Article 80, Uniform Code of

Military Justice (UCMJ), 10 U.S.C. § 880.[1] The court-martial sentenced Appellant to be dismissed from the service. The convening authority approved the sentence as adjudged.

On appeal, Appellant raises two issues before this court: (1) whether the military judge erred in denying a defense motion to abate the proceedings due to the government's destruction of evidence; and (2) whether the evidence is factually insufficient to sustain a guilty finding under either a subjective or objective test for the defense of entrapment. During our Article 66(c), UCMJ, 10 U.S.C. § 866(c), review, we identified one additional issue not raised by Appellant: whether Appellant is entitled to appropriate relief because the convening authority failed to take action within 120 days of trial as required by *United States v. Moreno*, 63 M.J. 129 (C.A.A.F. 2006). We specified this issue on 28 January 2021, and provided both parties an opportunity to respond. Both parties provided timely briefs on the specified issue. Finding no error that materially prejudiced a substantial right of Appellant, we affirm the findings and sentence.

## I. BACKGROUND

On 7 March 2016, Special Agent (SA) MW from the Air Force Office of Special Investigations (AFOSI), developed an online persona named "Amanda" and posted a solicitation "[r]eally want to talk to a [sic] Air Force pilot" on the social media application, Whisper.[2] The post was part of an AFOSI operation intended to prevent crimes against children. That same day, Appellant responded to the solicitation. After approximately 30 minutes of initial conversation, "Amanda" informed Appellant that she was a 14-year-old high school freshman. The conversation eventually moved off Whisper to Google Voice,[3] which made it easier for SA MW to identify Appellant.

After this initial conversation Appellant continued to talk to "Amanda" for over two months as he traveled the world for work and pleasure. "Amanda" continued to provide reminders of her age by including statements such as "I'm a freshman in hs;" "I'm 14;" "my dad is enlisted;" "I'm going to bed…got school in the morning;" "Dunno…boys my age r dumb so I don't hang out with them very much;" "my parents give me money and I do chores;" "I have to hide the app from my parents…;" "some stupid church class my mom put me in ugh…Ill be done early tho;" "lol can imagine a 14 yr old high school freshman in a war

---

[1] References to the Uniform Code of Military Justice (UCMJ) and Rules for Courts-Martial (R.C.M.) are to the *Manual for Courts-Martial, United States* (2016 ed.).

[2] Whisper is a social media application designed to facilitate conversations.

[3] Google Voice is a social media application designed to facilitate conversations.

zone lmao;" "hey…sorry I haven't been on… I got grounded and had my stuff taken away;" and "I'm the 14 year old girl aspiring to be a pilot lol."[4] Despite these reminders, Appellant continued communicating with "Amanda."[5]

Several of the online conversations demonstrated that Appellant believed he was talking to a 14-year-old girl and that he knew it was wrong. At one point "Amanda" asked for a picture of his "smiling face" to which Appellant replied, "That's risky!" Appellant then sent a picture of his face. SA MW replied by sending a picture of a girl who was actually in her 20's, to which Appellant replied "Daaaaang you are cute!!!" "You look at least 20 ha ha . . . not sure if that's a compliment but it should be." Despite Appellant saying that "Amanda" looked 20 years old, there is nothing in the rest of the conversations that would suggest Appellant believed he was talking to anyone other than a 14-year-old girl. Eventually the conversations turned sexual in the following exchange:

> [Appellant:] What are you doing tonight . . . Ha ha i just wanted another pic
>
> ["Amanda":] Lol I know…sry…just not up to it yet . . . I'm sittin in my bed watching Netflix . . . Family guy
>
> [Appellant:] Whoops I don't know why that sent twice . . .  Okay you owe me though . . . Nice…wish I was there!
>
> ["Amanda":] Lol easy now…don't creepy on me lol . . . Well if you were here I dunno if I would wanna watch tv…
>
> [Appellant:] Ah ha ha . . . What would we do?
>
> ["Amanda":] Hmmm…to be honest . . . I'm not super experienced . . . with…ya know ;-)
>
> [Appellant:] Ha ha . . . With what? :)
>
> ["Amanda":] Lol I'm shy . . . I think u can figure it out…lol ur a guy right
>
> [Appellant:] Ha ha . . . So you'd want some experience huh?
>
> ["Amanda":]  Lol well from someone who knows what they're doin…boys my age are so dumb

---

[4] Unless otherwise marked, Internet postings, texts, and other communications quoted in this opinion are presented verbatim without corrections.

[5] The hard ellipses (…) are present in the original communications; spaced ellipses (. . .) are inserted by this court to indicate consecutive messages from the same sender. No words are omitted from the original communications.

[Appellant:] I think I know what I'm doing . . . I've had success before ;)

["Amanda":] Oh really? What would you want to do...

[Appellant:] Anything you want! . . . Just say it and it's yours

["Amanda":] Hmmmm that's a big question . . . I guess I want a teacher

[Appellant:] Oh yea?

["Amanda":] Gentle but not afraid to do stuff either

[Appellant:] Show you how amazing things can feel?

["Amanda":] Yes:-)

[Appellant:] Touch places no one has ever touched . . . Feel things you've never felt

["Amanda":] Yes more than anything . . . Tell me more . . . Please...

[Appellant:] It would take a long time . . . I like doing things right . . . And there'd be a lot to do

["Amanda":] That sounds like the right way tho

[Appellant:] Of course . . . I don't like rushing into things . . . Sometimes the anticipation is the best

["Amanda":] That sounds amazing . . . I wouldn't want to rush straight into my first time

[Appellant:] There'd be so many things to show you first . . . So many places to touch and taste

["Amanda":] What would you show me . . . Tell me...I want to see . . .

. . .

[Appellant:] I would show you how lips and tongue would feel . . . On every inch of your body

Later, in response to being asked if he needed some company, Appellant stated to "Amanda," "Yes please. . . And someone to help get my frustrations out ;) . . . It's been a long time since I've touched someone . . . Or been touched."

In May of 2016, Appellant told "Amanda" that he wanted to be with her "kissing . . . [c]uddling a little . . . [t]hen touching . . . [u]ntil we're touching everything . . . I'd let you grab my hand . . . [a]nd put it where you want to be touched . . . [t]he insides of your legs . . . [y]ou want me to touch your wetness

4

. . . [m]aybe lick it up, too . . . I could lick . . . [e]at . . . [p]ut my tongue in deep . . . I bet you taste so sweet." Appellant then informed "Amanda" that he was "[j]ust playing a little." He then sent "Amanda" multiple pictures of his penis. Following several days of nonsexual conversations concerning Mother's Day, soccer and deployed life, the following exchange occurred:

> [Appellant]: It's always nice to have a friend in the shower!
>
> ["Amanda"]: Ur too cute . . . What else
>
> [Appellant]: Well… making out in the shower I'd like making out in the rain, only better!
>
> ["Amanda"]: Mmmm hmm…then what . . .
>
> [Appellant]: Well it's better because its nice and warm . . . Plus we'd both be naked
>
> ["Amanda"]: That does sound nice…what else
>
> [Appellant]: Lots of touching… Kissing… Anywhere you want!
>
> ["Amanda"]: Well I would leave that to you . . . You're the experienced one remember lol
>
> [Appellant:] Oh yea? . . . So you'd let me do whatever I wanted?
>
> ["Amanda"]: Well what do you wanna do…
>
> [Appellant]: Touch…lick…kiss . . . Alllll over!
>
> ["Amanda"]: Then after that?
>
> [Appellant]: Whatever you tell me :)
>
> ["Amanda"]: I like you to take charge of everything
>
> [Appellant]: Everything?! . . . Because in that case I might be tempted to slip inside you…
>
> ["Amanda"]: Oh yeah . . . Tell me more
>
> [Appellant]: It would feel so good . . . You'd be so wet so it would be easy just to slide in . . . slow but deep

Appellant also repeatedly attempted to have "Amanda" send him pictures including pictures of her "soccer body." Appellant's conversations with "Amanda" stopped when he was apprehended in Afghanistan on 25 May 2016. Appellant was eventually charged with two specifications in violation of Article 80, UCMJ. The first specification alleged that, on divers occasions, Appellant attempted to commit a lewd act upon a person whom he believed to be under the age of 16 years by intentionally communicating indecent language to her with the intent to gratify his own sexual desires. The second specification

alleged Appellant attempted to commit a lewd act on a child whom he believed to be under the age of 16 years by engaging in indecent conduct by intentionally exposing his male genitalia in order to gratify his own sexual desires.

## II. DISCUSSION

### A. Destroyed Evidence

Appellant asserts the military judge erred in denying Appellant's motion to abate the proceedings due to the Government losing the raw data on the government iPad used to conduct the investigation. Specifically, Appellant argues that the lost evidence was of such central importance that it was essential to a fair trial and that there was no adequate substitute for the destroyed evidence. We disagree.

### 1. Additional Background

The conversations that SA MW had with Appellant as "Amanda" were conducted on a government iPad. After Appellant was apprehended, SA MW took screen-shots of the conversations and created a portable document format (PDF) file that included all of the screenshots of the conversations with Appellant. SA MW testified, subject to cross-examination, that he turned in the iPad at the conclusion of his investigation, and that someone else unknown to him reset the iPad and lost the raw data of the conversations between "Amanda" and Appellant. SA MW did not create a forensic image of the iPad or use any forensic extraction tool to preserve the original data on the iPad. Similar data regarding these same conversations between Appellant and "Amanda" were also extracted and recovered from Appellant's Samsung Galaxy S III cellular phone.

At trial, Appellant's defense team filed a motion to abate the proceedings due to their inability to get the raw data extracted from the iPad that SA MW had used to communicate with Appellant or the underlying data with respect to the creation of the PDF file of the conversations. The Government opposed the defense motion in writing. In addition to the written filings, there was extensive witness testimony, including testimony from SA MW and Mr. WO, an expert in computer forensic analysis, on the topic of the iPad and the lost evidence. The military judge actively participated and asked several questions during the examinations of the witnesses.

In addition to the testimonies, the military judge also heard argument from both parties.[6] The military judge and all the parties agreed that *United States*

---

[6] During argument on the motion, trial defense counsel stated that they were raising a constitutional or due process challenge under *California v. Trombetta*, 467 U.S. 479 (1984), "only to preserve it for the purposes of the record." In *Trombetta*, the United

*v. Simmermacher,* 74 M.J. 196 (C.A.A.F. 2015), was the applicable law to apply to the facts of the case.

The military judge made his initial ruling via email, denying the defense request to abate the proceedings. In this ruling the military judge found that Appellant was "able to obtain comparable evidence to the raw data[7] on the iPad and the image files used in the PDF constructed by SA [MW] through other reasonable means." The military judge also found that the Defense "failed to demonstrate the exculpatory value of these items was apparent before being lost" and that the Defense "failed to demonstrate bad faith." Finally, the military judge found that the items were "not of such central importance to an issue that any are essential to a fair trial."

As anticipated in his original email ruling, the military judge supplemented his ruling in writing. In his supplemental ruling, the military judge included the essential findings of fact. The military judge found that when SA MW completed his service as part of the undercover operation, he left behind the iPad as well as the computer used to create the PDF files. The iPad was later reset, and whatever information relevant to the investigation of Appellant was lost from the iPad and the computer used to create the PDF. However, the military judge found that the image files were accurately translated to a PDF, and, combined with the testimony of SA MW, the evidence was preserved for trial and that nothing of substance was lost or destroyed. Additionally, he concluded that the text strings pulled from Appellant's phone substantially matched the information in the PDF. He further found as fact that whatever information may have been lost was not exculpatory or material. The military judge found no malign efforts by the Government or its agents existed when the evidence was lost, and nothing was lost in an effort to gain a tactical advantage.

The military judge then discussed his conclusions of law. The military judge found that Appellant was able to obtain comparable evidence to the raw data on the iPad and the image files used in the PDF file constructed by SA MW through other reasonably available means. He further found that the Defense failed to demonstrate that the exculpatory value of the items was apparent

States Supreme Court held that the destruction of breath samples used to determine intoxication levels did not amount to a due process violation due, in part, to the fact they were destroyed pursuant to regular practice and in good faith. 467 U.S. at 488. At Appellant's court-martial, trial defense counsel affirmatively conceded that they were making no arguments related to "bad faith" on the part of the Government.

[7] The military judge later explained in his written ruling on the motion, "[a]s it was used in the parties' filings and during oral argument, 'raw data' in this ruling refers to the digital information saved, temporarily held or deleted but still readable through forensic examination of an electronic device."

before being lost and also that they failed to demonstrate bad faith on the part of the Government. The military judge also found under Rule for Courts-Martial (R.C.M.) 703(f)(2) the previously mentioned items were not of "such central importance to an issue that any were essential to a fair trial." He wrote:

> [t]he potential for the raw data on the iPad and image files used in the PDF file constructed by [SA MW] to provide additional information, let alone additional information of central importance to an issue such that it would be essential to a fair trial, is speculative. Indeed, while comparison between the various forms of evidence still available is useful to some degree, the focus must be properly placed on the [Appellant's] Samsung Galaxy S III cellular phone as forensic examination of the iPad could never uncover messages sent from the former but not delivered to the latter.[8]

Based on the evidence and the testimony presented, the military judge concluded that there were "adequate substitutes for all such evidence too, though the unavailability of the items is concededly neither the fault of nor could it have been prevented by the defense." He then denied the defense motion to abate the proceedings.

**2. Law**

"A military judge's failure to abate proceedings is reviewed for an abuse of discretion." *Simmermacher*, 74 M.J. at 199 (citing *United States v. Ivey*, 55 M.J. 251, 256 (C.A.A.F. 2001)). An abuse of discretion occurs when a court's findings of fact are clearly erroneous or the decision is influenced by an erroneous view of the law. *United States v. Lubich*, 72 M.J. 170, 173 (C.A.A.F. 2013). On a motion to abate, the Defense bears the burden of persuasion on any factual issue, the resolution of which is necessary to decide the motion. R.C.M. 905(c)(2)(A).

---

[8] The military judge included a footnote at this point in his ruling that stated:

> Based on the evidence and testimony presented, the Court has also weighed the possibility that messages might have been sent from [Appellant]'s Samsung Galaxy S III cellular phone and delivered to the iPad but then, somehow, been recoverable only through forensic examination of the iPad (and thereby lost from the screenshots of the iPad, the remainder of the of the investigative file and the memory of SA [MW]). This remote and unlikely set of circumstances would need to involve substantive and meaningfully different information than that already available through alternative sources as well to be of central importance to an issue such that it would be essential to a fair trial. Such potential was entirely speculative as well and does not justify the requested relief of abatement.

Rule for Courts-Martial 703(f)(2) provides, in pertinent part:

> [A] party is not entitled to the production of evidence which is destroyed, lost, or otherwise not subject to compulsory process. However, if such evidence is of such central importance to an issue that it is essential to a fair trial, and if there is no adequate substitute for such evidence, the military judge shall grant a continuance or other relief in order to attempt to produce the evidence or shall abate the proceedings, unless the unavailability of the evidence is the fault of or could have been prevented by the requesting party.

While constitutional due process protections of this kind require an appellant to prove bad faith on the part of the Government,[9] the United States Court of Appeals for the Armed Forces (CAAF) has held that "R.C.M. 703(f)(2) is an additional protection the President granted to servicemembers whose lost or destroyed evidence fall within the rule's criteria." *Simmermacher*, 74 M.J. at 201. Unlike the analysis under the Constitution, a violation of R.C.M. 703(f)(2) may be found even when there is no bad faith on the part of government officials.

When seeking abatement because evidence was destroyed, the defense must show: (1) the evidence is of such central importance to an issue that it is essential to a fair trial; (2) there is no adequate substitute for the evidence; and (3) the defense was not at fault for the evidence being destroyed. R.C.M. 703(f)(2). Abatement of the proceedings is only a remedy when all three criteria of the above rules are satisfied. *Simmermacher*, 74 M.J. at 201 n.5.

### 3. Analysis

As an initial matter, we do not find the military judge's findings of fact were clearly erroneous. The military judge found that SA MW took screenshots of the communications with the Appellant he had on his government iPad and subsequently converted those screenshots into a PDF file. The military judge further found that when SA MW completed his service as part of the undercover operation, he left behind the iPad as well as the computer used to create the PDF files. The iPad was later reset, and all information relevant to the investigation of Appellant was lost from the iPad and the computer used to create the PDF. Additionally, the military judge found that the image files were accurately translated to a PDF, and combined with the testimony of SA MW, the evidence was preserved for trial and that nothing of substance was lost or destroyed. Finally, he found that Appellant had not demonstrated that

---

[9] See *Arizona v. Youngblood*, 488 U.S. 51, 58, 109 S. Ct. 333, 102 L. Ed. 2d 281 (1988).

whatever information may have been lost was not exculpatory or material and that no malign efforts by the Government or its agents existed when the evidence was lost, and nothing was lost in an effort to gain a tactical advantage. In rendering these findings, most with the consensus of the parties, the military judge had the benefit of testimony from SA MW and Mr. WO, the forensic expert, which included extensive cross-examination by defense counsel as to SA MW's investigation of Appellant, the subsequent handling of the iPad, and other matters that bore upon the credibility of the witnesses.

In reviewing the military judge's conclusions, we find that the military judge did not abuse his discretion in concluding that the raw data on the iPad and the image files SA MW used to create the PDF file were not of such central importance that they were essential to a fair trial. The military judge found that the communications between SA MW and Appellant were accurately transferred to a PDF file and that along with the testimony of SA MW preserved the entire record of the conversations for trial. He also concluded that the Defense also had the benefit of the data recovered from Appellant's cell phone to challenge the evidence presented by the Government. Finally, there was no evidence presented challenging the accuracy of the information in the PDF file. Therefore, sufficient facts existed to support the military judge's findings and conclusions.

In arriving at his conclusion, the military judge applied the correct law in finding that an adequate, and potentially better, substitute for the raw data and the image files existed. Whether an adequate substitute exists for lost or destroyed evidence depends upon the purpose of the evidence. In *Simmermacher*, the CAAF found no reasonable substitute existed because the appellant was "challenging whether the government's urinalysis test result was in fact correct and whether there had been any adulterations to or misidentifications of the sample." 74 M.J. at 202. Because the urine sample was the sole source of the evidence for the Government's allegations, a laboratory report could not effectuate the purpose without the sample. *Id.* When determining whether an adequate substitute is available, a military judge has broad discretion. *Id.* Here the military judge found that although the iPad used by SA MW was not available, a PDF file that he created with the images from iPad was. Additionally, substantially similar information recovered from Appellant's own cell phone also existed. As the military judge concluded, the data from Appellant's cell phone was potentially a better source of information because it could potentially reveal additional messages that were sent by Appellant but never received by SA MW on the iPad. Based on the facts of this case and the military judge's correct application of the law, we conclude the military judge did not abuse his discretion by failing to abate the proceedings.

**B. Defense of Entrapment**

Appellant also contends that the evidence was factually insufficient to sustain a finding of guilty under both the subjective and objective test for the defense of entrapment. Specifically, with respect to defense of entrapment Appellant makes two arguments: (1) that the government agent posing as "Amanda" was the instigator of sexual talk, and that Appellant was not predisposed to commit the offense; and (2) that the conduct of the government agent was "shocking to the judicial conscience." We also reviewed for legal sufficiency. We disagree with Appellant's contentions.

**1. Additional Facts**

At trial the Government presented the "Amanda" chat logs as well as separate chat logs discovered on Appellant's phone. The separate chat logs, admitted as Prosecution Exhibit 10, contained conversations Appellant had with other users in and around the time he was having conversations with "Amanda" until the time of his arrest. These chat logs detail that, between 1 March 2016 and 27 April 2016, Appellant communicated with several different unknown users. Some of the messages Appellant sent to these users were: "I'm playing with myself [smiling emoji];" "Do you have a pic?;" "Kinda horny;" and "Would you kiss me all over?" During a chat with one unknown user, Appellant told the user he was "15" when asked "how old are u?" During a chat with another unknown user, the user wrote, "Sorry my parents said I couldn't date way older people sorry." Appellant responded, "You're parents don't need to know! Ha ha." And another unknown user told Appellant she was "14 and a female." Appellant later responded, "Do you have a pic" and "What have you done with girls?"

At trial, and in response to the military judge's questions, the Government conceded that some evidence of entrapment was raised. The military judge gave the entrapment instruction to the members with respect to both specifications. As to Prosecution Exhibit 10, the military judge instructed the members that they could consider the exhibit to determine if Appellant was entrapped, and also to determine Appellant's intent to gratify his sexual desire for the charged offenses. The Defense did not object to these instructions nor did they ask the military judge to instruct on mistake of fact as to age.

**2. Law**

This court reviews issues of legal and factual sufficiency *de novo. United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes,* 38 M.J. 270, 272 (C.M.A. 1993) (citations omitted).

The test for factual sufficiency "is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed

the witnesses," we are "convinced of the accused's guilt beyond a reasonable doubt." *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F. 2000) (quoting *United States v. Turner*, 25 M.J. 324, 325 (C.M.A. 1987)). "In conducting this unique appellate role, we take 'a fresh, impartial look at the evidence,' applying 'neither a presumption of innocence nor a presumption of guilt' to 'make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *United States v. Wheeler*, 76 M.J. 564, 568 (A.F. Ct. Crim. App. 2017) (alteration in original) (quoting *Washington,* 57 M.J. at 399).

"The test for legal sufficiency is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Robinson*, 77 M.J. 294, 297–98 (C.A.A.F. 2018) (quoting *United States v. Rosario*, 76 M.J. 114, 117 (C.A.A.F. 2017)). While we must find evidence is sufficient beyond a reasonable doubt, it "does not mean that the evidence must be free from conflict." *United States v. Galchick*, 52 M.J. 815, 818 (A.F. Ct. Crim. App. 2000) (citations omitted).

"In resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner*, 56 M.J. 131, 134 (C.A.A.F. 2001) (citations omitted). As a result, "[t]he standard for legal sufficiency involves a very low threshold to sustain a conviction." *United States v. King,* 78 M.J. 218, 221 (C.A.A.F. 2019) (alteration in original) (citation omitted), *cert. denied*, __ U.S. __, 139 S. Ct. 1641 (2019).

In order to find Appellant guilty of an attempt offense under Article 80, UCMJ, the Government was required to prove beyond a reasonable doubt that he did a certain overt act, that the act was done with the specific intent to commit a certain offense, that the act amounted to more than mere preparation, and that the act apparently tended to effect the commission of the intended offense. *See Manual for Courts-Martial, United States* (2016 ed.) (*MCM*), pt. IV, ¶ 4.b.

In order for Appellant to be found guilty of the attempted offense of sexual abuse of a child, as alleged in Specification 1 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant, on divers occasions, intended to commit a lewd act upon "Amanda" by intentionally communicating indecent language to a child whom he believed had not attained the age of 16 years, with an intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(d). Similarly, for Appellant to be found guilty of the attempted offense of sexual abuse of a child, as alleged in Specification 2 of the Charge, the Government was required to prove beyond a reasonable doubt that Appellant intended to commit a lewd act upon "Amanda" by intentionally

engaging in indecent conduct with a child who he believed had not attained the age of 16 years, to wit: intentionally exposing his genitalia to "Amanda" with the intent to gratify his own sexual desire. *See MCM*, pt. IV, ¶ 45b.b.(4)(e).

The "government is free to meet its burden of proof with circumstantial evidence." *King*, 78 M.J. at 221 (citations omitted). This includes proving an accused's belief about whether another person is a minor. *See United States v. Maxwell*, 45 M.J. 406, 425 (C.A.A.F. 1996).

With respect to the affirmative defense of entrapment, R.C.M. 916(g) states: "[i]t is a defense that the criminal design or suggestion to commit the offense originated in the Government and the accused had no predisposition to commit the offense."

In the usual case, applying what is known as the "subjective" test for entrapment, the defense has the initial burden of showing some evidence that an agent of the Government originated the suggestion to commit the crime. *United States v. Whittle*, 34 M.J. 206, 208 (C.M.A. 1992). Once raised, "the burden then shifts to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense . . . ." *Id.* (citations omitted). When a person accepts a criminal offer without an extraordinary inducement to do so, he demonstrates a predisposition to commit the crime in question. *Id.*

"Inducement" means more than merely providing the appellant the means or opportunity to commit a crime. *United States v. Howell*, 36 M.J. 354, 358 (C.M.A. 1993). Instead, the Government's conduct must:

> [C]reate[ ] a substantial risk that an undisposed person or otherwise law-abiding citizen would commit the offense . . . . Inducement may take different forms, including pressure, assurances that a person is not doing anything wrong, persuasion, fraudulent representations, threats, coercive tactics, harassment, promises of reward, or pleas based on need, sympathy, or friendship.

*Id.* at 359–60 (emphasis, internal quotation marks, and citations omitted).

The Government may use undercover agents and informants to ferret out crime and afford opportunities or facilities for criminals to act upon without implicating the defense of entrapment. *Jacobson v. United States*, 503 U.S. 540, 548 (1992); *see also Howell*, 36 M.J. at 358; *Whittle*, 34 M.J. at 208. "Artifice and stratagem may be employed to catch those engaged in criminal enterprises." *Sorrells v. United States*, 287 U.S. 435, 441 (1932); *see also United States v. Russell*, 411 U.S. 423, 435–36 (1973). For example, law enforcement officers may pretend to be someone other than a government agent. *See Howell*, 36 M.J. at 358.

In addition to the "subjective" test for entrapment, military courts have recognized an "objective" test whereby a court may find the Government's conduct so outrageous or shocking to the judicial conscience that it violates an accused's right to due process under the Fifth Amendment,[10] and thereby constitutes entrapment as a matter of law. *United States v. Berkhimer*, 72 M.J. 676, 680 (A.F. Ct. Crim. App. 2013); *see United States v. Vanzandt*, 14 M.J. 332, 343 n.11 (C.M.A. 1982). To establish entrapment as a matter of due process, the appellant must show either excessive government involvement or significant government coercion in causing the crime to occur under the totality of the circumstances. *Berkhimer*, 72 M.J. at 680. In *Berkhimer* we further explained:

> This is an "extraordinary defense reserved for only the most egregious circumstances" and is not to be invoked every time the government acts in a deceptive manner or participates in a crime it is investigating. To meet the threshold standard of being fundamentally unfair or shocking, the accused must generally show the government acted with coercion, violence or brutality to the person.

*Id*. (citations omitted). "The issue of whether an accused's due process rights were violated is a question of law that this Court reviews de novo." *Id*. (citation omitted).

### 3. Analysis

Appellant contends that the evidence was factually insufficient to sustain the conviction under both the subjective and objective test for the defense of entrapment. Specifically, Appellant contends that the agent posing as "Amanda" "lured" him into a crime by posting a generic message, "Really want to talk to a [sic] Air Force Pilot," and then by sending him pictures of a female who appeared to be 20 years old. Appellant also contends that the AFOSI agent re-engaged Appellant after a delay in the conversations and was the instigator of the sexual talk in conversations with Appellant.

We begin our analysis by concluding without deciding that since the military judge provided an entrapment instruction to the members that at least some evidence was presented to raise the affirmative defense of entrapment. Under the subjective test, the burden then shifted to the Government to prove beyond a reasonable doubt that the criminal design did not originate with the Government or that the accused had a predisposition to commit the offense.

---

[10] U.S. CONST. amend. V.

Appellant initiated the sexual conversations with "Amanda." The AFOSI agent through "Amanda" merely created the opportunity to commit the offense. A person who commits an offense without an extraordinary inducement from a Government agent to do so demonstrates a predisposition to commit the offense, and is not the victim of entrapment. *Whittle*, 34 M.J. at 208. Appellant chose to respond to the generic advertisement and to continue the correspondence after being informed that "Amanda" was only 14 years old. In addition to initiating the sexual conversations, Appellant discussed various sexual acts, asked "Amanda" to do the same, and sent "Amanda" photos of his penis. Appellant's predisposition is fortified by the evidence concerning his conduct during other conversations with additional purported underage individuals on the Internet. "Amanda" did not initiate sexually explicit conversations, nor did she coerce or threaten Appellant into any course of action. Appellant was given repeated reminders of "Amanda's" age and had multiple chances to discontinue the conversation. We find that the Government's conduct did not create a substantial risk that an undisposed person or otherwise law-abiding citizen would commit these crimes, and that Appellant, by his actions, demonstrated his predisposition to commit the underlying offenses. Therefore, he was not entrapped under the subjective test.

We continue our analysis by applying the objective test. Under that standard, Appellant must demonstrate "fundamentally unfair or shocking" law enforcement behavior in order to prevail. *Berkhimer*, 72 M.J. at 680.

We are not persuaded the AFOSI agent in this case engaged "unfair" or "shocking" law enforcement behavior. At the outset of their correspondence, "Amanda" informed Appellant that she was only 14 years old and continued to provide reminders of her age throughout their conversations. Despite these multiple opportunities to end the conversation, Appellant willingly continued to communicate with "Amanda" and sent messages describing oral sex and sex in a shower, and offering to "teach" her about sex. In addition, he sent "Amanda" photos of his penis and repeatedly asked for pictures in return. The record indicates he did both not because he was coerced or fearful, but in order to gratify his sexual desires. The fact that some of "Amanda's" messages encouraged Appellant to describe what he was thinking, that "Amanda" re-initiated the conversations at certain points, and that SA MW sent Appellant pictures of a 20-year-old woman, when sufficient evidence demonstrates that Appellant believed he was talking to a 14-year-old high school student, did not coerce Appellant's behavior. It also fails to "outrage" or "shock" our judicial conscience to the point of establishing a due process violation.

Accordingly, considering the evidence in the light most favorable to the Prosecution, a reasonable factfinder could have found beyond a reasonable doubt that Appellant was not entrapped, and we are ourselves convinced

beyond a reasonable doubt that Appellant was not entrapped. We are also convinced that Appellant's conviction on both specifications of the charge are legally and factually sufficient. In assessing the legal sufficiency, we are limited to the evidence produced at trial and are required to consider it in the light most favorable to the Government. We conclude that a rational factfinder could have found beyond a reasonable doubt all of the essential elements of Appellant's convicted offenses. Furthermore, in assessing factual sufficiency, after weighing all the evidence in the record of trial and having made allowances for not having personally observed the witnesses, we are convinced of Appellant's guilt beyond a reasonable doubt. Therefore, we find Appellant's convictions on the charge and specifications are legally and factually sufficient.

## C. Post-Trial Delay

Finally, we address whether Appellant's due process right to a speedy post-trial review was violated when the convening authority failed to take action on his case within 120 days after his sentence was announced. We resolve this issue adversely to Appellant.

### 1. Additional Background

The court reporter in this case was assigned on 20 November 2018 and was present at Appellant's motion hearing on 10–11 December 2018. According to the court reporter's chronology included in the record of trial (ROT), she sent the first 84 pages of the transcript to trial counsel and defense counsel for review on 18 December 2018.[11] While working on other cases she continued to transcribe Appellant's motion hearing. Appellant's trial concluded on 12 April 2019 and the court reporter began transcribing Appellant's trial on 15 April 2019. Based on her workload, the court reporter sought and obtained assistance in transcribing Appellant's trial proceedings. In all, three additional court reporters transcribed parts of Appellant's trial. After the transcription

---

[11] Neither Appellant nor the Government addressed whether these chronologies are part of the "record" as defined in R.C.M. 1103(b)(2) or are "matters attached to the record"—also referred to as "allied papers"—under R.C.M. 1103(b)(3). *See United States v. Jessie*, 79 M.J. 437, 440–41 (C.A.A.F. 2020). We note Air Force Manual 51-203, *Records of Trial*, Atch. 2 ¶ 3 (4 Sep. 2018), calls for the inclusion of a court reporter chronology in the record of trial, and Air Force Instruction 51-201, *Administration of Military Justice*, ¶ A11.2.2 (18 Jan. 2019), requires the creation of a "chronology or similar documentation" and its inclusion in the record of trial "[i]f more than 120 days has elapsed between sentence and convening authority action." Neither party has objected to our considering the court reporter chronologies. Accordingly, we consider these documents in our analysis. *Cf. United States v. Stanton*, 80 M.J. 415, 417 n.2 (C.A.A.F. 2021) (considering discharge request and action upon it without deciding whether they were part of the "entire record" because parties did not object).

was completed, the military judge supplemented and then authenticated Appellant's record on 24 September 2019, 155 days after trial.

On 24 September 2019, the staff judge advocate signed his recommendation, which was received by Appellant on 30 September 2019. On 10 October 2019, Appellant's trial defense counsel requested additional copies of some exhibits and attachments that were previously provided to Appellant.[12] New copies of this information were sent to Appellant. Due to defense counsel's travel schedule, the copies were not received until 8 November 2019. On 12 November 2019, Appellant's counsel sent an email informing the staff judge advocate that Appellant would not be submitting any matters in clemency. The convening authority took action on 15 November 2019, 217 days after trial.

**2. Law**

We review whether an appellant has been denied the due process right to a speedy post-trial review de novo. *See United States v. Moreno*, 63 M.J. 129, 135 (C.A.A.F. 2006) (citing *United States v. Rodriguez*, 60 M.J. 239, 246 (C.A.A.F. 2004); *United States v. Cooper*, 58 M.J. 54, 58 (C.A.A.F. 2003)). *Moreno* established a presumption of facially unreasonable delay when the convening authority does not take action within 120 days of the completion of trial. *Id.* at 142. When there is such a delay, we examine the four factors set out in *Barker v. Wingo*, 407 U.S. 514, 530 (1972): "(1) the length of the delay; (2) the reasons for the delay; (3) the appellant's assertion of the right to timely review and appeal; and (4) prejudice." *Moreno*, 63 M.J. at 135 (citing *United States v. Jones*, 61 M.J. 80, 83 (C.A.A.F. 2005); *Toohey v. United States*, 60 M.J. 100, 102 (C.A.A.F. 2004) (per curiam)). "No single factor is required for finding a due process violation and the absence of a given factor will not prevent such a finding." *Id.* at 136 (citing *Barker*, 407 U.S. at 533).

*Moreno* adopted the post-trial delay framework for analyzing prejudice which considers these interests for prompt appeals: "(1) prevention of oppressive incarceration pending appeal; (2) minimization of anxiety and concern of those convicted awaiting the outcome of their appeals; and (3) limitation of the possibility that a convicted person's grounds for appeal, his or her defenses, in case of reversal and retrial, might be impaired." *Id.* at 138–39 (citations omitted). Even in the absence of prejudice, we have authority under Article 66(c), UCMJ, 10 U.S.C. § 866(c), to grant relief for excessive post-trial

---

[12] This information was provided via sworn declaration by Lt Col SM, the staff judge advocate at Ellsworth Air Force Base, South Dakota, on 23 February 2021. Since this issue was raised in the record but was not fully resolvable by those materials, Lt Col SM's declaration was considered consistent with *Jessie*, 79 M.J. at 445.

delay when we determine such relief is appropriate. *United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F. 2002) (citations omitted). Our court has established the following factors to be considered to determine if relief under *Tardif* is appropriate:

> 1. How long did the delay exceed the standards set forth in [*Moreno*]?
>
> 2. What reasons, if any, has the government set forth for the delay? Is there any evidence of bad faith or gross indifference to the overall post-trial processing of this case?
>
> 3. Keeping in mind that our goal under *Tardif* is not to analyze for prejudice, is there nonetheless some evidence of harm (either to the appellant or institutionally) caused by the delay?
>
> 4. Has the delay lessened the disciplinary effect of any particular aspect of the sentence, and is relief consistent with the dual goals of justice and good order and discipline?
>
> 5. Is there any evidence of institutional neglect concerning timely post-trial processing, either across the service or at a particular installation?
>
> 6. Given the passage of time, can this court provide meaningful relief in this particular situation?

*United States v. Gay*, 74 M.J. 736, 744 (A.F. Ct. Crim. App. 2015), *aff'd*, 75 M.J. 264 (C.A.A.F. 2016).

**3. Analysis**

Because the convening authority did not take action until 217 days after the conclusion of Appellant's court-martial, the 120-day threshold established in *Moreno* was exceeded by 97 days. Thus, this passage of time amounts to a presumptively unreasonable post-trial delay. In considering the reasons for the delay, the chronologies included in the record of trial indicate the primary delay in completing post-trial processing was the transcription of the proceedings. Ultimately, the transcript amounted to 1,253 pages, and the entire record of trial spanned 12 volumes. The transcription was not completed until 155 days after the court-martial, yet there is no indication the Government was either intentionally or negligently dilatory in completing this transcription, as at least four court reporters were involved in transcribing the record. The military judge also did not submit his supplemental rulings or authenticate the record until 14 September 2019. In addition, the court reporter provided the sections of the records to the military judge and trial counsel to review as she completed them, most likely to streamline the review process and avoid any additional delays in finalizing the transcript. The court

reporter's chronology indicates she was performing reporting duties for a variety of other proceedings during these 155 days.

While taking 155 days to transcribe Appellant's court-martial is not ideal, the period appears to be the product of little more than a voluminous record and scarce and heavily tasked court-reporter resources. Once the transcript was complete, the staff judge advocate prepared his draft recommendation to the convening authority. The recommendation was received by Appellant on 30 September 2019. Appellant was then entitled to ten days to file clemency matters. On 10 October 2019, Appellant's counsel informed the Government that it needed additional copies of a couple of exhibits and attachments. The legal office provided the requested information to Appellant. On 12 November 2019, Appellant confirmed he would not be submitting any matters. On 15 November 2019, the convening authority took action. The record was promptly docketed with our court on 3 December 2019. In sum, the majority of the days between authentication of the record and action were allocated to ensuring Appellant received the entire record and ensuring Appellant's opportunity to submit clemency matters, an opportunity of which he did not avail himself. In light of the foregoing, we conclude the reasons for the delay between Appellant's court-martial and the convening authority's action were explained to our satisfaction.

As to the remaining *Barker* factors, Appellant did not assert a right to timely action by the convening authority at any time prior to action, and Appellant has identified no prejudice that he has suffered. Having considered Appellant's assignment of error, we have ourselves failed to identify any way in which Appellant was prejudiced. The delay did not result in oppressive confinement as Appellant's sentence did not include incarceration. Additionally, because we are not ordering a rehearing, Appellant's ability to defend himself at such a rehearing has not been impaired. Finally, Appellant has not suggested he suffered any particularized anxiety or concern during the 217-day period. Where there is no qualifying prejudice from the delay, there is no due process violation absent a delay so egregious as to "adversely affect the public's perception of the fairness and integrity of the military justice system." *United States v. Toohey*, 63 M.J. 353, 362 (C.A.A.F. 2006). Based upon the evidence before us, the two primary drivers of the delay in the post-trial processing of this case was simply the court reporter's workload and attempts to ensure Appellant received a complete record and had an opportunity to submit clemency matters. We do not find any negligence or malfeasance on the part of the Government. Considering the circumstances, we cannot find that the delay would adversely impact the public's perception of the military justice system. We have also considered the factors set out in *Gay*, and we conclude Appellant is entitled to no relief even in the absence of identifiable prejudice.

## III. CONCLUSION

The approved findings and the sentence are correct in law and fact, and no error materially prejudicial to the substantial rights of Appellant occurred. Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are **AFFIRMED**.

FOR THE COURT

CAROL K. JOYCE
Clerk of the Court